

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-20-1994

# Phillipines v. Westinghouse Elec. Corp.

Precedential or Non-Precedential:

Docket 93-5667

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Phillipines v. Westinghouse Elec. Corp." (1994). *1994 Decisions.* Paper 223.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/223

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————

No. 93-5672

—————

THE REPUBLIC OF THE PHILIPPINES; NATIONAL
POWER CORPORATION

Appellants,

vs.

WESTINGHOUSE ELECTRIC CORPORATION;
WESTINGHOUSE INTERNATIONAL PROJECTS COMPANY;
BURNS AND ROE ENTERPRISES, INC.

Appellees.

—————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. Civil No. 88-cv-05150)

—————

ARGUED MAY 13, 1994

BEFORE:  BECKER and LEWIS, Circuit Judges,
and POLLAK, District Judge[*]

(Filed December 20, 1994)

—————

———————————

[*]    Honorable Louis H. Pollak, United States District Judge for
the Eastern District of Pennsylvania, sitting by designation.

David J. Cynamon
William P. Barr (ARGUED)
Shaw, Pittman, Potts & Trowbridge
2300 N Street, N.W.
Washington, DC  20037

      <u>Attorneys for Appellants</u>


Richard W. Clary (ARGUED)
Cravath, Swaine & Moore
825 Eighth Avenue
Worldwide Plaza
New York, NY  10019-7415

      <u>Attorney for Appellees, Westinghouse Electric
Corporation and Westinghouse International
Projects Company</u>


Glenn A. Mitchell
Stein, Mitchell & Mezines
1100 Connecticut Avenue, N.W.
Suite 1100
Washington, DC  20036

      <u>Attorney for Appellee, Burns and Roe
Enterprises, Inc.</u>

_____

OPINION OF THE COURT
_____


LEWIS, <u>Circuit</u> <u>Judge</u>.

      This case raises important issues at the intersection of two principles:  our deep-seated belief that a district court must be permitted to protect the integrity of its fact-finding process, and the settled considerations which courts in the United States must heed when considering whether to enjoin the executive activities of a foreign sovereign carried out in that

sovereign's own territory.  The district court found that the Republic of the Philippines was harassing witnesses who had testified against it in a suit it had brought in federal court in New Jersey.  Thus, the court enjoined the Republic from continuing this harassment.  The court also denied interlocutory certification of an underlying jury verdict so as to enforce its injunction, and ordered that any settlement in the case be conditioned upon acceptance of the court's continuing jurisdiction to enforce its injunctions.  Because the district court exceeded its authority, we will reverse.

I.

A.

In 1988, the Republic of the Philippines (the "Republic") and the National Power Corporation ("NPC") filed a complaint against Westinghouse Electrical Corporation and Westinghouse International Projects Company (collectively "Westinghouse") and Burns and Roe Enterprises, Inc. ("Burns and Roe") concerning the construction of a nuclear power plant in Bagac, Bataan.  The fifteen-count complaint alleged breach of contract, fraud, tortious interference with fiduciary duties, negligence, civil conspiracy, violations of state and federal racketeering statutes, and violations of the Robinson-Patman Act and the New Jersey Consumer Fraud Act.  The district court determined that all but two of the counts against Westinghouse were subject to international arbitration.  Republic of the Philippines v. Westinghouse Electric Corp., 714 F. Supp. 1362 (D. N.J. 1989).  Thus, most of the Republic's claims against Westinghouse were referred to arbitration under the Rules of Conciliation and Arbitration of the International Chamber of Commerce.[1]  In the remaining two counts, the Republic and NPC alleged that Westinghouse and Burns and Roe had conspired to bribe then-President Ferdinand Marcos in order to win the power plant contract, and had thus tortiously interfered with the fiduciary duties that Marcos had owed the people of the Philippines.

_____

[1].     The court ruled that only one count of the plaintiffs' complaint against Burns and Roe was subject to arbitration, but

While preparation for the trial on the tortious interference counts proceeded in New Jersey, arbitration implicating the other counts proceeded apace in Geneva. In late 1991, reaching the bribery allegations in the context of the Republic's challenge to the validity of the contract's arbitration clause, the arbitrators found that the Republic had failed to show that Westinghouse had bribed President Marcos. When the arbitrators included this finding in a preliminary award for Westinghouse and Burns and Roe, entered in December, 1991, the defendants moved for summary judgment in the district court, claiming the arbitrators' preliminary award collaterally estopped the Republic and NPC from litigating the bribery and tortious interference claims. The district court denied the motion and, when settlement discussions broke down, the case went to trial in March, 1993.

As the district court noted in the opinion supporting the order now before us, "[f]rom all accounts in the Philippine press, [the filing of the suit against Westinghouse and Burns and Roe and the arbitration in Geneva] assumed enormous importance in the eyes of Philippines leaders." District Court Opinion ("Op." at 5. The court explained that "[c]onstruction of the power plant had been undertaken to help solve the desperate electrical power shortage in the Philippines. Huge foreign loans were incurred to pay for the project." Id. When Marcos left the

(..continued)
nevertheless stayed all of the non-bribery counts against Burns and Roe in the interest of judicial economy.

Philippines and the Aquino government suspended construction of the power plant, "the Republic found itself with a partially completed plant which was producing no electricity, an ever worsening shortage of electrical power, and a huge foreign debt burden on which, it is said, interest alone amounts to $300,000 each day." Id. Thus, the court surmised that "[i]t appears that the leaders of the Republic looked to a judgment in this case and in the arbitration proceedings as the solution to these staggering problems." Id. The court further surmised that this factual context "may provide some explanation of the untoward events which transpired after the jury rendered a verdict against the Republic." Id.

During the trial, two Filipino Westinghouse workers, Pedro A. Padre, Jr. and Jerry R. Orlina, testified for Westinghouse. In addition, Westinghouse introduced an affidavit from Perfecto V. Fernandez, a professor of law at the government-owned University of the Philippines. The affidavit had been rendered two years prior to the trial, when Westinghouse had moved for summary judgment, and discussed Philippine law relevant to the issues in the case. This testimony, the subsequent actions threatened and taken by the Republic against the witnesses, and the court's responses are the subjects of this appeal.

B.

After a lengthy trial, the jury returned a verdict for Westinghouse and Burns and Roe on the bribery and tortious interference counts. Because the other claims were still stayed pending arbitration, the Republic filed a motion for certification pursuant to Fed. R. Civ. P. 54(b) to appeal the issues that had been adjudicated. At a hearing held on June 28, 1993 to consider this motion, the court was inclined to grant certification, stating that "there is no case more appropriate for certification than this one" (Joint Appendix ("J.A.") at 41) and that "clearly [the case] should be certified" (J.A. at 44).

However, Westinghouse then advised the court that it had evidence that Padre, Orlina and Fernandez were being harassed and subjected to retaliation by Philippine officials because of their testimony on behalf of Westinghouse. When these allegations were brought to its attention, the court abruptly changed its mind about certification, stating that although the facts needed to be developed,

> if there is a basis to [the allegation of harassment], it is a very, very serious charge, because nobody could come into this Court and then abuse people who come and testify. Some very dramatic, drastic remedies would have to be provided . . . It would be destructive of our whole system. No foreign government should be allowed to use our court system and then not play fair with the witnesses in the case. I can't think of anything more destructive of our system, and simply could not permit it.

J.A. at 49-50.  The court concluded that it must "hold off" on signing the Rule 54(b) certification because it would lose jurisdiction once the notice of appeal was filed.  Id. at 50.

The court ordered briefing and requested a motion from Westinghouse formally requesting relief from the court.  Westinghouse filed a motion requesting that the court (1) enjoin the Republic from further harassing any witnesses, (2) sanction the Republic by barring it from further prosecuting its claims before the district court or appealing the adverse jury verdict, and (3) grant Westinghouse its attorneys' fees incurred on the motion.

The court held a hearing in early July, 1993, at which argument was presented on the documentary evidence submitted by the parties relating to the Westinghouse motion, including affidavits of various parties, transcripts of television programs, news clippings, and other data.  In correspondence with the parties after the hearing, the court explained that, having considered materials submitted by the Republic with a renewed motion for certification, it believed that "the Republic ha[d] anticipated some of the requirements which are contained in my proposed order [addressing the allegations of harassment], although others remain to be fulfilled."  J.A. at 107.  Thus, the court circulated its proposed opinion and order and scheduled another hearing for September 27, 1993, at which it heard argument about the actions the Republic had taken to address the court's concerns.  Not fully satisfied with the Republic's

explanations at this final hearing, however, the district court indicated that it would finalize its opinion and order shortly.

On October 4, 1993, the court filed the opinion and order. The court found that, since the jury verdict, Orlina, Padre, and Professor Fernandez had been "the target of vilification in the public press inspired by officials in the Philippines government and each has been the target of actual or threatened government action." Op. at 15. The court stated that the "attack[s]" were "spearheaded" by Francisco A. Villa, Overall Deputy Ombudsman of the Republic, a presidential appointee whose duties include initiating investigations and directing "any public official to perform any act required by law and to request assistance from any governmental agency." Id. at 16.

The court found that Deputy Ombudsman Villa had threatened on numerous occasions to take legal action for tax fraud against Padre and Orlina as a result of their testimony on behalf of Westinghouse. The court found that both Padre and Orlina had faced public censure and lost business opportunities because of the Republic's actions, and that they would be financially ruined if tax evasion charges were brought against them. In this regard, the court also found it significant that another Filipino who had been involved in the same activities as Padre and Orlina had agreed to testify for the Republic -- and was then granted immunity from prosecution for tax evasion. Op. at 13, 19.

The court also documented that Villa had initiated disciplinary proceedings against Professor Fernandez for having

allegedly violated Philippine law by testifying against the government while under its employ.  Although the Republic had known about Fernandez' affidavit when it was submitted to the court in 1991, Villa filed charges relating to the affidavit on May 31, 1993, twelve days after the verdict.  Villa charged that, by filing an affidavit on behalf of Westinghouse, Fernandez had violated his duty as a public officer "to be loyal at all times to the Republic and the Filipino people . . . ."  Op. at 21, quoting administrative complaint.  The court noted that the administrative complaint concluded by stating that Fernandez, "in a cowardly attempt to escape the clutches of the law, whimpered `I'm not even a government official.  I'm just a lowly college professor.'"  Op. at 21, quoting administrative complaint, which quotes Philippines Daily Inquirer (May 20, 1993).  The complaint also quoted approvingly from a news columnist who had written that "Professor Fernandez should not only be fired from the State University but should be hanged in public at the courtyard of the Nuclear Plant in Morong, Bataan . . . ."  Id.  The court additionally found that Villa had called Fernandez a traitor "on a number of occasions, including a television show," and that "this characterization was repeated in the Philippine press." Id.  Based on the tone and substance of the administrative complaint, as well as the circumstances surrounding its filing, the court concluded that the charges against Fernandez were "motivated by rage at the jury verdict rather than considered judgment . . . ."  Id.

The Republic had submitted an affidavit from Villa purporting to establish that he did not institute proceedings against Fernandez because of the jury verdict, that Padre's and Orlina's fears are unwarranted, and that the Ombudsman's Office has not harassed any witness and had no intention of doing so. Op. at 24. However, the court found that Villa lacked credibility. Given the evidence of record, "for [Villa] to state that `[Padre's and Orlina's] fears and apprehensions are unfounded' is poppycock." Id. at 25. Furthermore, according to the court, the statements about Fernandez in Villa's affidavit continued to "reflect the Republic's rage at losing the case and its intent to strike out at one of the three persons seized upon as scapegoats for that loss." Id. And the court found that Villa's assertion that the Ombudsman's Office was not guilty of harassment was "simply not true." Id. at 25.

Although the evidence of harassment centered on Villa, the court determined that other members of the Philippines government had supported Villa's efforts. The court found ample evidence that Villa "was acting in accordance with the policies of the Office of the Executive, President Ramos." Op. at 22. The court also found that the harassment was not confined to the executive branch of government. Id. at 17 (noting that a Philippine senator had urged a study of the "culpability" of the three witnesses).

The court acknowledged that the Republic had submitted evidence purporting to show that the government did not support any action designed to harass or intimidate witnesses, and that

the government specifically did not intend to pursue any charges against Padre, Orlina, or Fernandez.[2]  The court noted that the evidence demonstrated "a partial retreat from the retaliatory conduct" the court had documented and indicated that the Republic intends "not to pursue the retaliatory conduct further against Padre and Orlina."  Op. at 28.  However, the court noted that the proceedings against Fernandez "continue[d] unabated."  Id. at 30.

Because the court found that the Republic's actions "threaten[] both the integrity of a United States District Court and the foundations of our system of justice" (Op. at 32), it concluded that it must take action.  Accordingly, it (1) enjoined the Republic from harassing any witness who had given evidence or will give evidence in this case or the arbitration proceeding; (2) directed the Republic to renounce and abandon its retaliatory actions, and to advise Padre and Orlina officially of its actions and intended actions with respect to their personal income taxes; (3) denied certification under Fed. R. Civ. P. 54(b) ("Rule 54(b) certification") until the Republic established that it was in compliance with the injunctive provisions of the court's order and that the proceedings against Fernandez were resolved "in a

---

[2].  With the renewed motion for certification, the Republic submitted a press release and statement noting that the Republic did not condone any retaliation against any past or future witness in any legal proceeding; documents purporting to show that Villa's proceedings against Fernandez were not in retaliation for his affidavit, but because Fernandez violated the law, and that Villa acted independently of the Executive; and statements purporting to establish that the government had taken steps to correct any mistaken impression that it intends to retaliate against any witness.

manner which cures the retaliatory actions"; and (4) directed that any settlement in the case must provide that the parties agree to the court's retention of jurisdiction to enforce the provisions of the order.  Op. at 35–36; Order at 1–3.[3]  The Republic appeals this order in its entirety.

## II.

The Republic's challenge to the district court's order presents three issues:  (1) whether the district court exceeded its authority in issuing the injunctive portions of its order; (2) whether the district court erred in refusing Rule 54(b) certification; and (3) whether the district court exceeded its authority in ordering that if the parties settle, they must stipulate to the district court's continuing jurisdiction to enforce its order.  We have jurisdiction over the injunctive portions of this order under 28 U.S.C. § 1292(a)(1),[4] and because of our resolution of the Republic's challenge to the injunctions, we find that the Rule 54(b) issue becomes moot.

---

[3].    The court denied without prejudice Westinghouse's motion to bar the Republic from proceeding with this case, as well as Westinghouse's request for attorneys' fees.

[4].    28 U.S.C. § 1292(a)(1) provides that, with exceptions not relevant here, "the courts of appeals shall have jurisdiction of appeals from:  (1) Interlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions . . . ."

III.

A.

The Republic has not adequately presented the issue of whether the district court's factual findings constitute clear error.[5] Nevertheless, it is clear from the briefing that the Republic disputes the district court's factual conclusions, and we reach the Republic's challenge because of the significance of this case not only to a foreign sovereign, but also to our domestic legal system. We believe the evidence supports the district court's conclusion that Deputy Ombudsman Villa, with the support of other members of the Philippines government, pursued a campaign designed to smear Padre, Orlina, and Fernandez as scapegoats for the Republic's failure to achieve victory in the district court.

---

[5]. Although the Republic stated in its initial briefing that it "strongly disagrees" with the district court's findings "that Philippine government officials engaged in retaliation against or harassment of witnesses in this case" (Appellant's Br. at 19), it did not squarely challenge those findings as clearly erroneous. See Burns and Roe Br. at 14 (noting Republic's failure to challenge findings). The Republic did raise the issue of clear error in its reply brief (Appellant's Reply Br. at 10-16), but that was one brief too late: we have often instructed that "appellants are required to set forth the issues raised on appeal and to present an argument in support of those issues in their opening brief." Kost v. Kozakiewicz, 1 F.3d 176, 182 (3d Cir. 1993); Institute for Scientific Info., Inc. v. Gordon & Breach, Science Publishers, Inc., 931 F.2d 1002, 1011 (3d Cir. 1991); Daggett v. Kimmelman, 811 F.2d 793, 795 n.1 (3d Cir. 1987); see also Fed. R. App. P. 28(a)(3) (requiring appellant to provide in brief "[a] statement of the issues presented for review"); Third Cir. Loc. App. R. 28.1(a)(i) (noting that party must comply with Fed. R. App. P. 28(a)(3) by designating where in record the issue presented for appeal was raised and what standard of review applies).

We further agree with the district court's observation that such behavior had "a doubly subversive effect. First, witnesses, who should have been able to rely upon both the implicit and explicit assurances of th[e district] court that they could testify fully and freely without fear of any retaliatory actions, have been betrayed." Op. at 33. Additionally, "witnesses from the Philippines will fear to testify for Westinghouse and against the Republic in the arbitration proceedings and in any future proceedings in th[e district] court, preventing each tribunal from receiving all the facts." Id. We therefore find no error in the district court's conclusion that the Republic's harassment created a "situation that no court can tolerate, and that effective relief must be granted." Id. at 34.

Before we turn to the question of whether the district court's chosen relief was an abuse of its discretion, however, we note certain facts of significance. Although the district court found that the Republic's acts were retaliatory, it did not find that they were without foundation. In other words, the district court did not find that Padre and Orlina could not, under normal circumstances, be prosecuted for the activities they admitted to in open court in New Jersey. The court also stated that it accepted for purposes of its order that "under normal circumstances" Villa could file charges against Fernandez for his

acceptance of compensation for providing an affidavit in this case. Op. at 34.[6]

The court also concluded that by the time it filed its order, the Republic had taken steps to "cure the effects of the retaliatory actions against Padre and Orlina and any additional steps which may be required can be taken readily." Id. The only element of the challenged conduct that remained was the administrative complaint against Fernandez.

Additionally, the court concluded for the purposes of its order that the Ombudsman's Office is independent of the Executive Branch. Op. at 34. Thus, it tacitly accepted the argument that the Republic could not compel Villa to withdraw his complaint against Fernandez (see id.), and for the purposes of this opinion, we make the same assumption.[7]

We also note a subsequent factual development not considered by the district court. During the pendency of this matter before us, we were informed by counsel for the Republic

---

[6]. We reach no conclusion about whether the evidence provided at trial, or the fact of Fernandez' providing affidavits to Westinghouse, constitute evidence of wrongdoing under Philippines law. We note only that the district court did not conclude that the charges against Padre, Orlina, and Fernandez were meritless, whatever the motivations may have been in threatening or bringing them.

[7]. Indeed, there appears to be substantial support for this proposition. See Constitution of the Philippines Art. XI, § 5 (1987) (Office of the Ombudsman established as independent office); In re Raul M. Gonzalez, 160 S.C.R.A. 771, 775 (1988) (Ombudsman and deputies may be removed only through impeachment in Congress for "culpable violation of the Constitution, treason, bribery, graft and corruption, other high crimes, or betrayal of the public trust").

that the administrative proceeding that had been initiated by Villa against Fernandez had been dismissed by the President of the University of the Philippines.  Noting that Fernandez had offered his opinion on a matter of public importance, the President of the University wrote that while

> [i]t is conceded that Prof. Fernandez' point of view may appear to be unacceptable to some or more Filipinos[,] . . . the role of academe is to continually engender varying thoughts, positions, theories and postulates on various key issues and concerns affecting the nation.  This is not the first time that a dissenting voice has been put forth against the position taken by officials of the Republic and if the University is to remain at all one of the bastions of free thought and speech, it most certainly will not be the last.

Order, In re Complaint of Deputy Ombudsman Francisco Villa v. Prof. Perfecto V. Fernandez of the College of Law 6 (May 5, 1994).[8]

With these facts in mind, we now address whether the injunctive portions of the court's order were lawful exercises of the court's discretion.

---

[8].    Cessation of the Republic's threats of tax fraud investigations against Padre and Orlina, and dismissal of the administrative complaint against Fernandez, do not moot the Republic's appeal of the injunctive portions of the order, since the district court's order is still in effect and that order reaches conduct targeted at other individuals, as well as the three named.  Yet these facts may play a role in the district court's assessment of a proper sanction of the Republic.

B.

The district court's findings force us to confront fundamental issues involving a federal court's power to control litigants who come before it.  As discussed below, a district court's power to sanction or exercise other forms of judicial control over a foreign sovereign is not coterminous with its power to regulate or punish other litigants.  Here, in issuing an order which purports to supervise and control the law enforcement activities of a foreign sovereign nation against its own citizens on its own soil, the district court exceeded the boundaries of its lawful discretion.

1.

Our legal system will endure only so long as members of society continue to believe that our courts endeavor to provide untainted, unbiased forums in which justice may be found and done. Thus, it is beyond peradventure that district courts have broad authority to preserve and protect their essential function. To ensure that district courts have tools available to protect their truth-seeking process, the Federal Rules of Civil Procedure allow district courts to sanction parties who fail to meet minimum standards of conduct in many different contexts. E.g., Fed. R. Civ. P. 11 (groundless pleadings and other papers); 16(f) (failing to abide by pretrial orders); 26(g), 30(g), 37(d), and 37(g) (discovery abuses), 41(b) (involuntary dismissal for failure to prosecute, failure to follow rules, or failure to obey court order); 45(f) (disobeying subpoena); 56(g) (providing affidavit at summary judgment in bad faith or for delay). Congress has also enacted laws providing additional powers to district courts to police misconduct. E.g., 18 U.S.C. § 401 (contempt power); 28 U.S.C. § 1927 (punishing attorneys who vexatiously multiply proceedings). See generally Chambers v. NASCO, Inc., 501 U.S. 32, 111 S. Ct. 2123, 2142 (1991) (Kennedy, J., dissenting) (listing sources of sanctioning authority).

Nor do those formal rules and legislative dictates exhaust district courts' power to control misbehaving litigants. To the contrary, the Supreme Court recently reaffirmed that a district court has inherent authority to impose sanctions upon those who would abuse the judicial process. Chambers, 111 S. Ct.

at 2132. In Chambers, a private party challenged a district court's order making him liable to his opponent for attorneys' fees of nearly $1 million expended because of the party's bad faith conduct during the course of litigation. The Court rejected the challenge, finding that the order was an appropriate exercise of the court's inherent powers to control litigants. The Court explained that "[i]t has long been understood that `certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers `which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" Id., quoting United States v. Hudson, 11 U.S. (7 Cranch) 32 (1812).[9] Such salutary powers, the Court noted, "are `governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of

---

[9]. The Court, in fact, unanimously recognized that district courts have inherent authority to fashion sanctions against parties in certain circumstances. Justice Scalia disagreed with the majority's interpretation of the order at issue in the case and therefore dissented, but nevertheless agreed with the majority that a court has the ability to "enter orders protecting the integrity of its proceedings." Chambers v. NASCO, Inc., 501 U.S. 32, 111 S. Ct. 2123, 2140 (1991). And while Justice Kennedy, in a dissent joined by the Chief Justice and Justice Souter, believed that a district court must first exhaust express grants of sanctioning power before utilizing its inherent authority (id. at 2141), he did not gainsay that district courts have such authority and may use it to combat abuses of the judicial process when other, express sources of authority fail (id. at 2141, 2149).

cases.'" Chambers, 111 S. Ct. at 2132, quoting Link v. Wabash R. Co., 370 U.S. 626, 630-31 (1962).[10]

Of course, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." Chambers, 115 L. Ed. 2d at 45. "A primary aspect of [a district court's] discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process" (id. (emphasis added)). Thus, a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified. In exercising its discretion under its inherent powers, the court should be guided by the same considerations that guide it in the imposition of sanctions under the Federal Rules. First, the court must consider the conduct at issue and explain why the

---

[10]. Illustrating the variety of powers exercised by a district court, the Supreme Court noted that courts can discipline attorneys, punish contempt, vacate judgments obtained by fraud, investigate whether a fraud upon the court has been committed, bar from the courtroom those who disrupt proceedings, dismiss actions on the ground of forum non conveniens, and dismiss a suit for failure to prosecute. Chambers, 111 S. Ct. at 2132-33. In the same spirit, we have noted that a district court may dismiss a suit outright in response to litigation abuses. Eash v. Riggins Trucking Inc., 757 F.2d 557, 566 (3d Cir. 1985) (in banc); see also, e.g., Frumkin v. Mayo Clinic, 965 F.2d 620, 627 (8th Cir. 1992) (court likely would not have abused discretion if it had dismissed suit because plaintiff had intimidated witnesses); National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 643 (1976) (per curiam) (dismissal under Fed. R. Civ. P. 37 not an abuse of discretion). And certainly, in appropriate circumstances, a district may enjoin a wrongdoing party from continuing its wrongful conduct or direct it to take corrective action. Cf. Gregory v. Depte, 896 F.2d 31 (3d Cir. 1990) (contempt sanction).

conduct warrants sanction.[11] If an attorney, rather than a client, is at fault, the sanction should ordinarily target the culpable attorney. Carter v. Albert Einstein Med. Center, 804 F.2d 805, 807 (3d Cir. 1986); Dunbar v. Triangle Lumber and Supply Co., 816 F.2d 126, 128-29 (3d Cir. 1987). Cf. Poulis v. State Farm Fire and Casualty Co., 747 F.2d 863, 868 (3d Cir. 1984) (court must consider "the extent of the party's personal responsibility," but this factor "is not dispositive, because a client cannot always avoid the consequences of the acts or omissions of its counsel"). Obviously, a pattern of wrongdoing may require a stiffer sanction than an isolated incident; a grave wrongdoing may compel a more severe sanction than might a minor infraction; and wrongdoing that actually prejudices the

_____

11. Although we stated in Landon v. Hunt, 938 F.2d 450 (3d Cir. 1991), that "a prerequisite for the exercise of the district court's inherent power to sanction is a finding of bad faith conduct" (id. at 454), that statement should not be read to require a finding of bad faith in every case, regardless of the sanction contemplated. Landon addressed the propriety of assessing attorneys' fees against a litigant; thus, we followed the Supreme Court's decision in Chambers, which also involved assessment of attorneys' fees. Landon, 938 F.2d at 454. Under the American Rule, attorneys' fees ordinarily may not be shifted to a losing party. However, the Court in Chambers had relied on an exception to that rule allowing fees to be shifted when the losing party exhibited "bad faith." Chambers, 111 S. Ct. 2133. As Justice Scalia pointed out in his dissent, however, the fact that fee-shifting as a sanction requires a finding of bad faith "in no way means that all sanctions imposed under the courts' inherent authority require a finding of bad faith." Id. at 2140. Thus, a court need not always find bad faith before sanctioning under its inherent powers: "[s]ince necessity does not depend upon a litigant's state of mind, the inherent sanctioning power must extend to situations involving less than bad faith." Id.; see generally Estate of Leon Spear v. Commissioner of IRS, No. 93-7727, __ F.3d __, 1994 WL 656893 at *9-*10 (3d Cir. Nov. 21, 1994) (discussing role of bad faith in sanctioning).

wrongdoer's opponent or hinders the administration of justice may demand a stronger response than wrongdoing that, through good fortune or diligence of court or counsel, fails to achieve its untoward object.  Furthermore, there may be mitigating factors that must be accounted for in shaping the court's response.

Second, having evaluated the conduct at issue, the district court must specifically consider the range of permissible sanctions and explain why less severe alternatives to the sanction imposed are inadequate or inappropriate.  Although the court need not "exhaust all other sanctioning mechanisms prior to resorting to its inherent power" (Landon v. Hunt, 938 F.2d at 450, 454 (3d Cir. 1991)), the court must explain why it has chosen any particular sanction from the range of alternatives it has identified.  See Poulis, 747 F.2d at 868 (sanctions under Fed. R. Civ. P. 16 and 37).

The district court did not explain under what authority it was proceeding in enjoining the Republic.  We deduce from the circumstances, and assume for purposes of evaluating the injunctive provisions of the district court's order, that it was acting under its inherent authority.  "We review a district court's imposition of sanctions under its inherent power for abuse of discretion" (Chambers, 111 S. Ct. at 2138), but we have made it clear that "a district court `would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'"  Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1279 (3d Cir. 1994), quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990).

At their core, the injunctive portions of the district court's order implicate international comity, that elusive doctrine -- something more than mere international manners, but less than obligation -- which attempts to mediate the frictions inherent in a community of sovereign states.  Comity, in the words of Justice Gray,

> is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

Hilton v. Guyot, 159 U.S. 113, 164 (1895).  The doctrine "is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the

rights of persons protected by its own laws."  Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971). Consequently, "comity serves our international system like the mortar which cements together a brick house.  No one would willingly permit the mortar to crumble or be chipped away for fear of compromising the entire structure."  Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 (D.C. Cir. 1984).

Comity cannot be the source of a disability that prevents a district court from having the power to address wrongdoing that impacts a domestic court.  As Hilton makes clear, comity must yield to domestic policy:  "no nation will suffer the laws of another to interfere with her own to the injury of her citizens . . . ."  Hilton, 159 U.S. at 164.  Thus, "from the earliest times, authorities have recognized that the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act."  Laker Airways, 731 F.2d at 937.

But while it is true that principles of comity cannot compel a domestic court to uphold foreign interests at the expense of the public policies of the forum state, it can -- and does -- force courts in the United States to tailor their remedies carefully to avoid undue interference with the domestic activities of other sovereign nations.  Comity is essentially a version of the golden rule:  a "concept of doing to others as you would have them do to you . . . ."  Lafontant v. Aristide, 844 F. Supp. 128, 132 (S.D. N.Y. 1994); see Mitsubishi Motors Corp. v.

Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985). Thus, it may be permissible to prescribe and enforce rules of law in a foreign country, but unreasonable to do so in a particular manner because of the intrusiveness of a particular type of sanction. That is the case here: the district court had the power to sanction the Republic for its wrongdoing, but it should not have entered the injunctive provisions at issue here.

The mere fact of sovereignty does not insulate a litigant from sanction for failure to abide by the rules governing litigation in American courts. It would be perverse to allow a foreign sovereign litigant to "take our law free from the claims of justice." National City Bank of New York v. Republic of China, 348 U.S. 356, 362 (1955). The Republic's actions, although taken in a foreign country, undeniably had effects in the United States. Under general principles of international law, a tribunal may prescribe laws with respect to "conduct outside its territory that has or is intended to have substantial effect within its territory." Restatement (Third) of the Foreign Relations Law of the United States §402(c) (1987) (the "Restatement"). And where a court may prescribe, it may also enforce. Id. § 431(1) ("A state may employ judicial or nonjudicial measures to induce or compel compliance or punish non-compliance with its laws or regulations, provided it has jurisdiction to prescribe in accordance with §§ 402 and 403"); see also United States v. Davis, 767 F.2d 1025, 1036 (2d Cir. 1985). Thus, because the district court found that the Republic's actions compromised the court's ability to adjudicate

fairly the claims before it, the district court had the power to address the retaliatory conduct notwithstanding that it transpired on foreign soil half a world away.

However, any exercise of jurisdiction to prescribe and enforce sanctions based on the effects of foreign activity in a domestic court requires the court to balance the interests it seeks to protect against the interests of any other sovereign that might exercise authority over the same conduct. See Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 383 (1959) (interpreting Jones Act in light of "due recognition of our self-regarding respect for the relevant interests of foreign nations in the regulation of maritime commerce"); Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1296 (3d Cir. 1979) (noting with respect to United States antitrust laws that "[w]hen foreign nations are involved . . . it is unwise to ignore the fact that foreign policy, reciprocity, comity, and limitations of judicial power are considerations that should have a bearing on the decision to exercise or decline jurisdiction"); Timberlane Lumber Co. v. Bank of America, 549 F.2d 597, 613 (9th Cir. 1976) (endorsing "jurisdictional rule of reason" in potential extraterritorial application of United States antitrust laws); Restatement § 402, 403. Consequently, although the courts of appeals have occasionally approved orders issued by district courts enjoining proceedings in foreign countries that would interfere with the proper exercise of district court jurisdiction, they have recognized that such action must be

exercised only in rare cases, and must be premised on a thorough analysis of the interests at stake.[12]

This balancing is evident in the principal cases advanced by both the Republic and Westinghouse in support or

---

12. The Restatement provides a useful, non-exclusive list of factors that should be considered when a court contemplates extending its reach to punish extraterritorial conduct:

(a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

(c) the character of the activity to be regulated, the importance of the regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

(d) the existence of justified expectations that might be protected or hurt by the regulation;

(e) the importance of the regulation to the international political, legal, or economic system;

(f) the extent to which the regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity; and

(h) the likelihood of conflict with regulation by another state.

Restatement (Third) of the Foreign Relations Law of the United States § 403(2) (1987). As the Restatement makes clear, this list is "not exhaustive." Id., comment b.

their respective positions.  For example, in United States v. Davis, 767 F.2d 1025 (2d Cir. 1985), Davis, a United States citizen, was charged with money laundering. Prior to trial, the United States government issued a subpoena to the Cayman Islands branch of the Bank of Nova Scotia, directing it to produce documents relating to Davis' activities.  When it appeared that the bank would comply with the subpoena, Davis filed an action seeking a temporary restraining order in the Cayman Islands to prevent the bank from disclosing the records, claiming that the district court action was improper and that the bank's compliance with the subpoena would violate a Cayman Islands law.  In response, the district court ordered Davis to cease his legal proceedings in the Cayman Islands.

The Second Circuit held that the district court had properly exercised its discretion in enjoining Davis from pursuing the Cayman Islands litigation.  Davis, 767 F.2d at 1037. The Court provided three reasons:  (1) the Cayman Islands litigation "had a direct, substantial and foreseeable effect on the United States," in that it was "instituted and pursued with the express purpose of" frustrating the United States action; (2) Davis had close links to this country and was thus subject to the court's jurisdiction; and (3) "the United States had a strong national interest in safeguarding the integrity of its criminal process."  Id.

The Davis court warned, however, that because orders enjoining parties from pursuing litigation in foreign tribunals "often restrict[] the jurisdiction of the foreign tribunal," such

orders "should . . . be used sparingly."  Davis, 767 F.2d at 1038.  Accordingly, the court emphasized that "because an order enjoining a litigant from continuing a foreign action is facially obstructive, international comity demands that this extraordinary remedy be used only after other means of redressing the injury sought to be avoided have been explored."  Id.

Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909 (D.C. Cir. 1984), is quite similar.  Laker Airlines ("Laker") filed a private antitrust suit in the United States against four American defendants, two British defendants, a Belgian defendant, and a Swiss defendant.  In response, the foreign defendants filed suit in Britain and secured an injunction prohibiting Laker from pursuing its case against them in the United States court.  Laker, in turn, requested and secured a restraining order in the United States prohibiting the American defendants from instituting similar preemptive suits in the United Kingdom.  Laker then filed another antitrust suit in the same United States district court naming two additional defendants, one Dutch and the other Belgian, and sought and received a restraining order prohibiting these defendants from seeking relief from suit in Britain.

The Dutch and Belgian defendants in the second American action appealed the injunction, claiming that the district court had exceeded its jurisdiction to prescribe and enforce -- and violated principles of international comity -- in enjoining the defendants from seeking relief in the British courts.  The District of Columbia Circuit affirmed, finding the injunction was

proper because litigation in Britain was designed solely to terminate the United States litigation and deprive the United States court of its rightful jurisdiction. Laker Airways, 731 F.2d at 930. However, the Laker Airways court stressed that comity required that the power to issue anti-suit injunctions be used "only in the most compelling circumstances," because such injunctions "effectively restrict the foreign court's ability to exercise its jurisdiction." Laker Airways, 731 F.2d at 927.

In Compagnie des Bauxites de Guinea v. Ins. Co. of North America, 651 F.2d 877 (3d Cir. 1981), we faced an injunction similar to those addressed in Davis and Laker Airways, but we reversed the district court. In Compagnie des Bauxites, Compagnie des Bauxites de Guinea ("CBG") brought a claim against several insurance companies because they would not honor a claim on policies issued to CBG. Almost four years later, the insurance companies filed a suit in the High Court of Justice, Queen's Bench Division in London, seeking a declaratory judgment rescinding the contract on the ground that CBG had failed to disclose material facts. The district court enjoined prosecution of the action in England, finding that the second action was duplicative, harassing and vexatious.

On appeal, we declined to "determine that the district court lacks the power to enjoin parties from pursuing an action in another jurisdiction in every case." Compagnie des Bauxites, 651 F.2d at 887. We found, however, that the sole reasons for the district court's injunction -- "duplication of issues and the insurers' delay in filing the [foreign] action" -- were

insufficient to justify "the breach of comity among the courts of separate sovereignties."  Id.

Thus, what we recognized in Compagnie des Bauxites, like the courts in Davis and Laker Airways, is that the exercise of a power to prescribe and enforce requires a balancing in each case.  The domestic court's purpose in protecting a particular interest must be set against the interests of any other sovereign that might exercise authority over the same conduct.[13]

Westinghouse urges that Compagnie des Bauxites, Laker Airways, and Davis demonstrate that the district court's injunction in this case was a permissible exercise of its power to protect "the proper exercise of its jurisdiction."  Westinghouse Br. at 36, 37–38.  The Republic correctly counters that the injunction in this case was very different from those issued in the cases relied upon by Westinghouse.  We assume, without deciding, that the district court had the power to provide the injunctive relief it purported to provide here.  Our focus, however, is on comity.  Unlike the district courts in Compagnie des Bauxites, Laker Airways, and Davis, the court here did not simply enjoin private litigants from pursuing parallel litigation in foreign jurisdictions.  Here, the district court's injunctions purport to place the court in the position of supervising the law enforcement activities of a foreign sovereign

---

[13].    Similar balancing is also evident in the other principal case relied upon by Westinghouse.  See Mutual Service Casualty Ins. Co. v. Frit Indus., Inc., 805 F. Supp. 919, 923 (M.D. Ala. 1992) (recognizing need to balance interests at stake in respective jurisdictions).

nation against its own citizens on its own soil.  The injunctive

paragraphs of the district court's order provide the following:

> (1)  the Republic is "permanently enjoined
>      from taking any action against any
>      witness who has testified or will
>      testify" in this action or the
>      arbitration "where that action is in
>      retaliation for such testimony or has
>      the intent or effect of harassing such a
>      witness for his or her testimony or
>      intimidating such a witness to change or
>      withhold his or her testimony"; and
>
> (2)  The Republic is "directed to take
>      appropriate steps to renounce and
>      abandon the retaliatory actions which
>      the court has found to have taken place,
>      which steps shall include officially
>      advising Pedro A. Padre, Jr. and Jerry
>      R. Orlina of the Republic's actions and
>      intended actions with respect to their
>      personal income taxes . . . ."
>
> (3)  "Should the parties settle this case, the
>      agreement of settlement and any judgment
>      implementing it shall contain a provision that
>      each party accepts the continuing jurisdiction of
>      th[e district] court to enforce the provisions of
>      this order."

Op. at 35; Order at 1-3.

The first two injunctive provisions thrust the district

court into the internal affairs of the Republic.[14]  The district

court acknowledged that the first injunctive paragraph, which

prohibits retaliation against not only Padre and Orlina, but "any

witness who has testified or will testify" in this action or the

arbitration, could place it in the position of acting, as the

---

[14].    The third injunctive paragraph, concerning settlement, is
addressed <u>infra</u> pp. 38-39
.

Republic's counsel put it to the district court, as "a special master over at least 50 witnesses who have already participated for both sides and are participating today in the arbitration, as well as literally hundreds of potential witnesses . . . ." J.A. 92. If any of those Filipinos received a traffic citation, or was involved in a tax fraud investigation, or had any other scrape with the law, the court acknowledged that it could be called upon by the individual to make a finding as to whether the Republic's prosecution was intended to harass or intimidate the witness. J.A. 93. And although the court did not go so far as to find that tax charges against Padre and Orlina would be unfounded (see supra p. 14), the second injunctive paragraph effectively directs the Republic to grant Padre and Orlina immunity from prosecution for past tax law violations.[15]

We are unaware of any court in the United States -- or elsewhere -- that has ever attempted to inject itself in this manner into the internal law enforcement activities of a foreign

---

[15]. Recalling that comity is like the golden rule, one could imagine the profound legal -- indeed, constitutional -- issues that would arise if the Executive Branch of the United States government were enjoined by a foreign court the way the district court has enjoined the Republic here. Were the shoe on the other foot, we would surely find it intolerable for a court in the Philippines to order the President of the United States to provide immunity for witnesses who had testified in a Philippines proceeding, silence members of Congress who called for an investigation of those witnesses, prevent members of Congress from even speaking in a manner that could be interpreted as harassment of those witnesses, or fire an independent prosecutor who had threatened or initiated proceedings against such witnesses.

sovereign.[16] The unique nature of the district court's injunctions is demonstrated by comparison to background precepts of international relations. Although countries sometimes exercise jurisdiction to prescribe and enforce laws that reach extraterritorial conduct, it is nevertheless widely accepted that each sovereign nation has the sole jurisdiction to prescribe and administer its own laws, in its own country, pertaining to its own citizens, in its <u>own</u> discretion. This principle was articulated in by Chief Justice Marshall in <u>The Schooner Exchange v. M'Fadden</u>, 11 U.S. (7 Cranch) 116 (1812):

> The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction.

<u>Id</u>. at 136. In his classic text on conflict of laws, Joseph Story agreed with his former colleague. Synthesizing the views of many publicists, Justice Story concluded that "it is an essential attribute of every sovereignty, that it has no admitted superior, and that it gives the supreme law within its own dominions on all subjects appertaining to its sovereignty."

---

[16]. Despite the facial similarity of this case to those decided under the act of state doctrine, this case is not cognizable under that rubric. The act of state doctrine is confined to cases in which a litigant seeks to challenge the <u>validity</u> of a public act of a foreign sovereign. <u>W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.</u>, 493 U.S. 400, 406 (1992).

Story on Conflict of Laws § 8 (7th ed. 1872).  And more recently, Professor Charles Hyde echoed Justice Story in explaining that "[i]ndependent States are equal in the sense that they resemble each other in possessing and enjoying the same privilege of freedom from external control in the management of their domestic or foreign affairs."  Charles C. Hyde, 1 International Law § 11 at 27 (2d rev. ed. 1951).  He added that "[a] State which habitually contents itself with less ceases to be the equal of independent States and finds itself in an inferior class."  Id. at 28.[17]

The principle also finds recognition in the Restatement:  "[u]nder international law, a state has . . .

_____

[17].    In addition to Story and Hyde, other scholars and publicists have long recognized the principle that a state is not subject to outside legal control of its internal legal affairs. E.g., Hugo Grotius, The Law of War and Peace 102 (Kelsey ed. 1925) ("That power is called sovereign whose actions are not subject to the legal control of another"); 4 Blackstone's Commentaries 66 (Sharswood ed. 1879) ("no[] . . . state[] will allow a superiority in the other"); Lassa F.L. Oppenheim, 1 International Law § 125 at 288 (8th ed. 1955) ("in the absence of treaty provisions to the contrary, a State is not allowed to interfere in the management of [other States'] internal or international affairs, nor to prevent them from doing or to compel them to do certain acts in their domestic relations or international intercourse"); Hedley Bull, The Anarchical Society: A Study of Order in World Politics 70 (1977) ("At the heart of th[e] complex of rules [of international coexistence] is the principle that each state accepts the duty to respect the sovereignty or supreme jurisdiction of every other state over its own citizens and domain, in return for the right to expect similar respect for its own sovereignty from other states"); Urban G. Whitaker, Jr., Politics and Power 411 (1964) ("Of all [the] elements bearing on problems of jurisdiction, the most important is territory.  Once it is decided which state controls what territory, it is possible to determine whose laws apply, whose courts may sit in judgment and who may enforce the law").

sovereignty over its territory and general authority over its nationals[.]"  § 206(a).  The Restatement explains that the term "sovereignty" is used in section 206(a) to imply "a state's lawful control over its territory generally to the exclusion of other states, authority to govern in that territory, and authority to apply law there."  Id. comment (a).[18]

---

[18].    This fundamental principle is also reflected in our law of sovereign immunity.  Courts of the United States no longer apply the "absolute" theory of sovereign immunity which once prevailed, supported by broad dicta in The Schooner Exchange, under which foreign states were deemed completely immune to suit in the United States.  The Schooner Exchange v. M'Fadden, 11 U.S. (7 Cranch) 116, 136-37 (1812).  However, the doctrine of sovereign immunity still has profound effects upon the jurisdiction of domestic courts.  The more modern, "restrictive" theory of foreign sovereign immunity, which was "largely codifi[ed]" by the Foreign Sovereign Immunity Act of 1976 (Republic of Argentina v. Weltover, Inc., __ U.S. __, 112 S. Ct. 2160, 2165 (1992), provides that "a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (jure imperii), but not as to those that are private or commercial in character (jure gestionis)."  Saudi Arabia v. Nelson, __ U.S. __, 113 S. Ct. 1471, 1479 (1993) (citations omitted).  Thus, the Act embodies the fundamental principle that sovereigns are generally immune from interference by courts in the United States.  As the Supreme Court recently explained in Saudi Arabia, 113 S. Ct. 1471, "[u]nder the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."  Id. at 1476 (citations omitted).

Certainly when, as in this case, a sovereign brings suit in the United States, it subjects itself to jurisdiction over matters incident to the suit, including counterclaims by the defendant (subject to limitations in the Foreign Sovereign Immunities Act).  See generally 28 U.S.C. § 1607; Nat'l City Bank of New York v. Republic of China, 348 U.S. 356, 361-63 (1955). But even in such circumstances, it cannot be seriously suggested that the plaintiff sovereign gives up its essential attributes of sovereignty, including in particular its authority to administer in its sole discretion its own laws respecting its own citizens within its own territory.

It is fundamental that law enforcement is a core function of government, and a court should be loathe to interfere with a foreign sovereign's exercise of such power if alternatives are available that may achieve the same result with less derogation of sovereignty. As we have made clear, supra n.10 and accompanying text, the district court had substantial power at its disposal in this case. It could have imposed monetary sanctions to signal its disapproval of the Republic's conduct and its intolerance of any future harassment or intimidation. It could also have dismissed the case. See supra n.10 (discussing Chambers, Eash, and National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639 (1976) (per curiam)).[19] To have exercised its discretion consistent with its authority, however, the district court should have balanced the interests at stake. This the court did not do,[20] and thus it failed to recognize that

---

[19]. Although we have stated that "[d]ismissal must be a sanction of last, not first, resort" (Poulis v. State Farm Fire and Casualty Co., 747 F.2d 863, 869 (3d Cir. 1984)), we did not mean to imply that it was, in all circumstances, the most extreme penalty possible. This case illustrates the exception: here, although dismissal would prevent the Republic from going forward with its claims, it would be less intrusive into the internal affairs of the Republic -- and therefore significantly less harmful to principles of international comity -- than the injunctive alternative chosen by the district court. Thus, Westinghouse misconceives the impact of the injunction in this case in arguing that because the district court had the "greater" power to dismiss this case, it could also enter the injunction as an exercise of a "lesser" power. Westinghouse Br. at 42.

[20]. The court recognized that its power to influence the proceedings against Fernandez was cabined by the "limits which United States courts impose upon themselves when asked to enjoin proceedings in other nations." Op. at 34, citing Compagnie des Bauxites de Guinee v. Ins. Co. of North America, 651 F.2d 877 (3d Cir. 1981). The court found that it could avoid any limitations

the extraordinarily intrusive nature of its injunctive provisions made such relief inappropriate.

Additionally, in this case as in any other, the district court should have noted what alternative sanctions were available, and at the very least should have explained why those options would not have achieved the results desired. See Davis, 767 F.2d at 1038. Yet the record is devoid of evidence that the district court considered any sanctions less drastic than the injunctive provisions it adopted.

The district court's error was compounded by its response when the Republic came forward, before the court's order was formalized, with evidence that it had achieved substantial compliance with paragraphs (1) and (2) of the draft order, at least with respect to Padre and Orlina. At that point, it was particularly inadvisable for the district court to have followed

(..continued)
on its authority by addressing Fernandez' situation "without enjoining the proceedings against him. I will simply defer granting the Republic's Rule 54(b) motion until I am satisfied that in one way or another the proceedings against Professor Fernandez have been resolved in a manner which cures the retaliatory actions described above." Op. at 34-35.

The court stated, however, that it did not "even want to hear anything about" the viability of its injunctive provisions, because it "[knew] that [it] ha[d] the authority to do it. Anybody who is a litigant here is subject to the jurisdiction of the Court." J.A. 103-04. The court further believed that any sovereign immunity the Republic had was waived when it filed suit in New Jersey, making the Republic exactly like any other litigant. Thus, the court stated that it did not "even want any research on that," because if the Republic did not have to submit to the court's authority, "I might as well pack up and go home." J.A. at 104.

through by entering those portions of its order because there was evidence that they were no longer even necessary.

Consequently, those portions of the court's order must be vacated. Although the district court could sanction the Republic for taking lawful actions for retaliatory reasons, the court could not interpose itself into the Republic's law enforcement functions as it attempted to do in its order. As explained below, we will remand for a redetermination of sanctions.

Because we are vacating the principal injunctive portions of the district court's order, it is also necessary to vacate its third injunctive provision, in which the court required that any settlement include a provision acknowledging the district court's continued jurisdiction to enforce its order. That provision no longer has any purpose once the other injunctions are vacated.[21]

---

[21]. Additionally, we note that under Fed. R. Civ. P. 41(a)(1)(ii), parties to a civil action may stipulate to a dismissal of an action at any time. A court has no authority to disapprove or place conditions on any such dismissal. First Nat'l Bank v. Marine City, Inc., 411 F.2d 674, 677 (3d Cir. 1969). As the Eighth Circuit recognized in Gardiner v. A.H. Robins Co., Inc., 747 F.2d 1180 (8th Cir. 1984), such an attempt would "deprive[] the parties of their unconditional right to a Rule 41(a)(1)(ii) dismissal by stipulation." Id. at 1190.

C.

The district court's order also provided that the Republic's motion for certification under Rule 54(b) would "not be granted until it establishes that it is in full compliance with" the principal injunctive portions of the order, discussed above, and "until the Court finds that the proceedings against Professor Perfecto V. Fernandez have been resolved in a manner which cures the retaliatory actions described above." Order at 2. The Republic asks us to find that the district court erred in refusing to certify the Republic's appeal under Rule 54(b). We find, however, that the Republic's challenge to this portion of the order is moot. We have invalidated the provisions of the order with which the Republic had to comply, and, as explained above, supra p. 15-16, the proceedings against Professor Fernandez were resolved in a manner that completely vindicated him. Thus, we need not reach the thorny issue of whether -- and how -- we could assert jurisdiction over a district court's denial of a motion to certify under Rule 54(b).

Of course, we are not directing the district court to certify any portion of this case for interlocutory review at this time. The decision to certify must be reached, if at all, after a sound exercise of the district court's discretion upon motion by one or both of the parties after remand.

## IV.

The Republic should be sanctioned for having retaliated against Padre, Orlina, and Fernandez. The district court moved with commendable expedition and firmness to address the trespass on its authority and integrity embodied in the retaliation by the Republic against Padre, Orlina and Fernandez. An American court cannot tolerate litigants' intimidation of witnesses, regardless of whether a litigant happens to be a foreign sovereign. However, for the reasons given, we conclude that the central elements of the district court's order went too far, and, accordingly, that order will be vacated. On remand, the district court shall reassess what sanctions should be imposed upon the Republic consistent with international comity as described in section III(B), supra. The district court should take into consideration the status of the Republic's actions regarding Padre, Orlina, and Fernandez, but we do not prejudge what sanctions should be imposed. In all events, however, when evaluating the issue of sanctions the district court shall set forth its findings in accordance with our discussion of sanctioning procedure in section III(B)(1), supra.

We will not instruct the district court to certify the jury verdict at this time. That question will be left to the district court's sound discretion upon proper motion by the Republic.