In re the PRUDENTIAL INSURANCE COMPANY OF AMERICA SALES PRACTICES LITIGATION.

This Document Relates to All Actions.

MDL No. 1061.
Civil Action No. 95–4704.

United States District Court,
D. New Jersey.

Jan. 6, 1997.

Melvin I. Weiss, Barry A. Weprin, Brad N. Friedman, Keith M. Fleischman, Salvatore J. Graziano, Seth Ottensoser, Milberg Weiss Bershad Hynes & Lerach, New York City, and Michael B. Hyman, Ellyn M. Lansing, Much Shelist Freed Denenberg Ament Bell & Rubenstein, Chicago, IL, Allyn Z. Lite, Joseph J. DePalma, Goldstein Till & Lite, Newark, NJ, for Plaintiffs.

. Reid L. Ashinoff, Michael H. Barr, Sonnenschein Nath & Rosenthal, New York City, and Edward A. Zunz, Jr., Alan E. Kraus, Riker Danzig Scherer Hyland & Perreti, Morristown, NJ, for Defendant Prudential Insurance Company of America.

## OPINION

WOLIN, District Judge.

█ This Opinion addresses the persistent and recurrent destruction of documents by agents and employees of The Prudential Insurance Company of America ("Prudential"). Because the preservation of documents and their availability for production is essential to the orderly and expeditious disposition of litigation, document destruction impedes the litigation process and merits the imposition of sanctions. Notwithstanding the absence of evidence of willful document destruction, repeated destruction of potentially discoverable materials demands that this Court preserve and protect its jurisdiction and the integrity of the proceedings before it.

## INTRODUCTION

Because of the need to resolve the destruction of document issue without delay, the Court has excerpted much of pages 1 through 30 of the Report of Investigation.[1]

---

1. The Court takes this opportunity to express its appreciation to the firm of Milberg Weiss Bershad Hynes & Lerach, for the prompt preparation and delivery of this report to the Court. The Court specifically acknowledges the dedication and effort of Melvyn I. Weiss, Barry A. Weprin, Brad N. Friedman, Keith M. Fleischman, Salva- tore J. Graziano, and Seth Ottensoser as the draftsmen of this report. Additionally, the Court expresses its appreciation to all the lawyers who participated in the taking of fifty-two depositions over a four-day period at a time of the year, December 20–24, when most legal machinery comes to a grinding halt, and deservedly so. The

The Court has incorporated by reference herein and relied upon the Compendium of Prudential Document Retention Notices ("the Compendium"), the fifty-two depositions taken in response to the Court's Order of December 18, 1996, the Affidavit of Reid L. Ashinoff in Opposition to Motion for Sanctions and Response of the Prudential Insurance Company of America to Plaintiffs' Report of Investigation dated December 31, 1996 ("Prudential's Response"). The Court has filed the Report of Investigation, the Compendium, and Prudential's Response with the Clerk of the Court.

In February and March 1995, Prudential policyholders commenced class actions against Prudential alleging that during the 1980s and early 1990s Prudential engaged in a scheme to sell life insurance through deceptive sales practices. On August 3, 1995, the Judicial Panel on Multidistrict Litigation transferred all related lawsuits throughout the country, including all class actions, individual actions, and former agent "whistleblower" actions, to this Court.

On September 15, 1995, this Court entered its first Order in the multidistrict litigation (the "September 15, 1995 Order"). The September 15, 1995 Order required, among other things, that all parties "preserve all documents and other records containing information potentially relevant to the subject matter of this litigation." September 15, 1995 Order at 4(d).

Subsequent to the September 15, 1995 Order, and throughout the pendency of this litigation, Prudential's preservation of documents has been a pervasive issue. For example:

On December 13, 1995, agents' lead counsel, Bruce Miller, raised in open court that Prudential was closing offices throughout the country, and requested an order "that the records that exist in these places must remain secure." December 13, 1995 Tr. at 112. Prudential's counsel, Reid Ashinoff, responded: "I don't have a problem with the substance of Mr. Miller's request." *Id.* at 113.

Ashinoff noted that Prudential could not agree never to destroy *any* document in the ordinary course of business, but otherwise confirmed: "Yet I agree in principle and substance to a point." *Id.*

In July 1996, the parties learned that a Prudential employee, David Fastenberg, had been accused of destroying Prudential documents. Thus, on July 23, 1996, plaintiffs' counsel and Miller brought this matter to the Court's attention, only to hear from Ashinoff that plaintiffs' counsel were engaged in "the rankest kind of smear campaign," and that once Ashinoff was retained in February/March 1995, warnings were issued that documents should not be destroyed. July 23, 1996 Tr. at 22, 24–25, 27.

Document destruction issues were also discussed in open court on October 21, 1996, December 6, 1996, and December 13, 1996.

On Saturday, December 14, 1996, Prudential's counsel informed plaintiffs' co-lead counsel in the class actions that documents relevant to this litigation in the Prudential Preferred Financial Services ("PPFS") Boston area office located in Cambridge, Massachusetts (the "Cambridge Office"), had improperly been destroyed by the Managing Director of the Cambridge Office during the pendency of this litigation. That this document destruction violated the September 1995 Order is not contested. Gillen 111–12.[2]

On Monday, December 16, 1996, plaintiffs obtained an Order to Show Cause why sanctions should not be imposed in connection with this document destruction (the "December 16, 1996 Order"). Specifically, the Court ordered Prudential to show cause on December 18, 1996 why the Court should not impose sanctions and other appropriate relief for "Prudential's destruction of relevant documents during the pendency of this litigation." *See* December 16, 1996 Order. The Order to Show Cause was served upon all parties who had entered an appearance in this multidistrict litigation.

firm of Sonnenschein Nath & Rosenthal is to be equally complimented for its willingness on behalf of Prudential to staff and defend these fifty-two depositions.

**2.** A list of deponents is contained in Appendix 3 to the Report of Investigation filed herewith.

On December 18, 1996, the Court held a hearing and, *inter alia,* ordered plaintiffs to conduct an investigation into the Cambridge Office document destruction incident and to ascertain "whether Prudential's notification on destruction of documents was or was not satisfactory." *See* December 18, 1996 Tr. at 44.

### 1. Scope of the Investigation

Pursuant to the Court's instructions, on December 18, 1996, plaintiffs' counsel undertook an extensive investigation into the circumstances and events surrounding the destruction of documents in Prudential's Cambridge Office. Accordingly, plaintiffs' counsel thoroughly investigated the timeliness of the actions taken upon the discovery of this incident and the adequacy of Prudential's document retention policies and/or guidelines, and the enforcement thereof. *See* December 18, 1996 Tr. at 44.

Between December 18 and December 24, 1996, plaintiffs' counsel reviewed hundreds of Prudential documents, including numerous documents that Prudential contends evidence its written policy concerning the proper handling and retention and/or destruction of documents.

Between December 20 and December 24, 1996, plaintiffs' counsel conducted fifty-two depositions. Plaintiffs' counsel deposed, among others: Arthur F. Ryan, Prudential's Chairman and Chief Executive Officer; Marc Grier, Prudential's Chief Financial Officer; James Gillen, Prudential's General Counsel; Rodger Lawson, a Prudential Executive Vice President; John M. Breedlove, the Managing Director of the Cambridge Office; Cheryl Rizzo, who was Breedlove's assistant; Melissa Gonzalez and Russ Spaulding, the members of the Prudential Compliance team who discovered the document destruction incident in the Cambridge Office; and each and every other person identified by Prudential's attorneys as associated with, or having knowledge of, the incident.

In addition, plaintiffs' counsel randomly selected and deposed thirteen agents associated with the Cambridge Office. Prior to these depositions, approximately fifty agents were requested to complete a questionnaire that plaintiffs' counsel created, to ascertain each agent's understanding and knowledge of any Prudential document preservation guidelines and the details of the Cambridge incident. Prior to taking any depositions, plaintiffs' counsel also interviewed David Greenbaum, one of Prudential's outside counsel who had investigated the Cambridge incident.

Throughout the depositions, additional documents were produced by the deponents and/or their counsel, including internal Prudential memoranda, questionnaires completed by Cambridge agents, and other documents relating to the Cambridge incident.

Furthermore, because plaintiffs' counsel learned that there had potentially been a destruction of relevant documents by Prudential employees in Prudential's Syracuse, New York office, plaintiffs' counsel deposed Paul Berrafato, General Manager of Prudential's Syracuse office.

### 2. Prudential's Document Destruction Policy and Document Retention Guidelines

#### A. Implementation/Communication

In early 1994, in response to a regulatory directive issued to most life insurance companies, Prudential undertook a sweep of all of its sales materials to avoid the use of unauthorized sales materials. All unapproved or outdated sales materials were collected, catalogued, and warehoused. Following that 1994 sweep, Prudential initiated a document destruction policy, which required the destruction of all unauthorized or outdated sales material. Prudential did not attempt to catalogue how many documents were destroyed, the locations they were taken from, or any other crucial details, such as who destroyed them. Nor did Prudential implement any training program. Rather, according to Prudential's senior management, Prudential policy was to keep a single copy of each piece of sales material so that it would be available to counsel for plaintiffs and to state regulators. Prudential distributed its document retention instructions on a number of occasions, typically through an e-mail system referred to as PROFS notes.

### (i) Prudential's Managing Director Audit Blueprint

Prior to May 1995, PPFS had no written instructions, policies, or procedures regarding the retention and/or destruction of unapproved material. *See* Tignanelli 250; Cataldo 14; Reynolds 34.

On May 26, 1995, PPFS issued "The Managing Director Marketing Material Audit Blueprint," which was designed to allow Managing Directors systematically to monitor and control the use of marketing material: "The Audit Blueprint is designed to provide a standardized procedure and checklist for Managing Directors to keep up with the on-going changes in marketing material so they can know what is and is not approved material." *See* Soderstrom Ex. 1 at 5.[3]

The Audit Blueprint is a written manual, printed in a format that permits it to be retained by individual company employees and placed on company bookshelves. It was distributed to all Prudential office managing directors. It provides—without qualification—that "disapproved material," *id.* at 7, and "out-of-date marketing material," *id.* at 9, should be destroyed; there is no provision on these pages that any copies should be retained.

Later in the document, the Audit Blueprint instructs a Managing Director on actions to take when unapproved marketing material is found in a client file, including destroying additional copies of the material:

> If a Managing Director finds unapproved marketing material in a Special Agent's client file, s/he should require the Special Agent to destroy any *additional* copies of such material, [footnote 15] and should counsel the Special Agent regarding PPFS policy on the use on unapproved materials with the public.

*Id.* at 14.

The only reference to document preservation in Prudential's Audit Blueprint is in footnote 15. This note states that unapproved marketing material found in a client file should not be destroyed:

Unapproved marketing material found in a client file should not be destroyed. The Managing Director should, however, attach a signed and dated note to the material indicating that it is not approved material and that the Special Agent has been instructed not to use the material in the future.

*Id.* at 14–15.

Prudential general counsel James Gillen confirmed that this corporate policy to destroy improper sales materials continues to this day with his approval. Gillen does not consider this destruction policy to be a violation of this Court's September 15, 1995 Order that required preservation of all potentially relevant documents. Gillen 105.

### (ii) PROFS Notes and Other Document Retention Notices

Unlike the Audit Blueprint, which was a written document that dealt primarily with Prudential's document destruction policy rather than with document retention, Prudential's principal medium of communicating its "document retention" practices was PROFS notes (e-mail). *See* Compendium at 2, 4–9, 11–14. Priscilla A. Myers, Prudential's Senior Vice President in charge of auditing, acknowledged that while electronic mail was a quick way to disseminate information, electronic mail notices "are usually followed up with a paper document." Myers 33. This was not done consistently in connection with document retention PROFS notes. Moreover, none of these PROFS notes indicate that they amend the Audit Blueprint, or that they should be kept with the Audit Blueprint.

Because Prudential's individual insurance organization is divided in three parts—PPFS, Prudential Select, and Prudential Insurance and Financial Services ("PIFS"), notices concerning document retention were sent to all three divisions, often by different management-level personnel of Prudential. The relevant notices were:

1. On August 9, 1995, a PROFS note addressed by Ira Kleinman to Prudential Select Associates stated that as a result of the multi-state task force investigation, Pru-

---

**3.** Exhibits from the depositions are denoted as "___ Ex. ___."

dential was amending all existing company document retention guidelines effective immediately. *See* Compendium at 2. The note stated:

> Do not destroy any documents currently being saved under any Company guidelines, even if the existing guidelines call for destruction (because of document age or other reasons).

> This includes, but is not limited to, any and all documents that relate to: insurance sales that used existing policy values (including dividends) or abbreviated pay plans ('APP'), such as agent training brochures or worksheets, marketing and point of sales materials, illustrations, policy disbursement records, client files and related materials, as well as customer complaints and Company disciplinary files.

This PROFS note provided telephone numbers which Prudential Select Associates could call if they had any questions and stated: "When in doubt about retaining a particular document, save it!" The PROFS note also warned that the Company and its employees could face severe sanctions if documents were destroyed and stated that "any willful or deliberate violation of these guidelines will result in serious disciplinary action, up to and including termination." *Id.*

2. On August 15, 1995, a hard-copy memorandum addressed by Thomas A. Croswell, Senior Vice President, Agencies, to all PIFS associates and representatives, repeated the contents of the above-described PROFS note, leaving out the warning that any willful or deliberate violation would result in disciplinary action and possible termination. Compendium at 3.

3. On August 17, 1995, a PROFS note addressed by Joseph P. Mahoney, to all PPFS associates, repeated the same message (again without the warning regarding possible termination). Compendium at 4.

4. On September 8, 1995, a PROFS note addressed by Joseph P. Mahoney to all PPFS associates instructed all Office Vision users to do the following, effective immediately:

> Do not destroy any Office Vision Notes which directly or indirectly relate to insurance sales involving the use of existing policy values (including dividends) or abbreviated pay plans ('APP'). This includes, but is not' limited to, Office Vision Notes which relate to agent training, marketing and point of sale materials, policy illustrations, customer complaints, or agent disciplinary files which concern the use of policy values (including dividends) or APP to sell life insurance.

Compendium at 6. The PROFS note stated that PPFS associates should contact their supervisor or the Law Department if they had any questions and stated: "When in doubt about a particular note, save it!" The PROFS note also warned that the Company and its employees could face severe sanctions if Office Vision Notes were destroyed. *Id.*

5. Also on September 8, 1995, PROFS notes containing the same text were addressed by Thomas A. Croswell to PIFS associates and representatives and by Ira Kleinman to all Prudential Select associates. Compendium at 5 and 6.

6. On September 14, 1995, Jeff Hahn, PPFS' Chief Legal Office and Vice President, addressed a PROFS note to all PPFS associates, which referred to the August 1, 1995 PROFS note sent by Joseph Mahoney and provided the following supplementing instructions, effective immediately:

> Do not destroy any Office Vision Notes which directly or indirectly relate to insurance sales involving the use of existing policy values (including dividends) or abbreviated pay plans ('APP') which relate to agent training, marketing and point of sale materials, policy illustrations, customer complaints, or agent disciplinary files which concern the use of policy values (including dividends) or APP to sell life insurance.

Compendium at 8. This PROFS note also stated that PPFS associates should contact their supervisor or the Law Department if they had any questions and, in the middle of a paragraph, stated: "When in doubt about a particular note, save it!" This PROFS note again warned that the Company and its employees could face severe sanctions if Office Vision notes were destroyed. *Id.*

7. On March 14, 1996, Bill Therrien addressed a PROFS note to all PROFS users repeating the above supplementary instruction, and substituting the term "PROFS notes" for "Office Vision Notes." Compendium at 13.

8. On August 14, 1996, Arthur Ryan addressed a PROFS note to Prudential associates which reported that David Fastenberg, the head of the Individual Insurance Group's Greater Southern Territory, was dismissed for failing to abide by and enforce Company directives to preserve documents. Compendium at 15.

9. On November 6, 1996, Kevin Frawley, Prudential's Chief Compliance Officer, addressed a hard-copy memorandum to all individual insurance employees and agents, stating that it was important to continue preserving documents that might relate to Prudential's recent class-action settlement and other lawsuits and investigations Prudential was facing. Attached to his memorandum was a document entitled "Interim Document Retention Guidelines." This document provided a detailed list of the types of documents that all employees and agents were instructed to retain. Compendium at 16.

10. On November 13, 1996, Kevin Frawley addressed the same memorandum to all individual insurance employees and agents, but added a sentence that such records might also be relevant to the Policy Remediation Program. Compendium at 17.

### (iii) The Distribution of Prudential's Notices

Most of the above-described notices were never circulated in hard copy. In fact, prior to November 6, 1996, only PIFS associates received a hard-copy memorandum regarding document retention; all others were sent only PROFS notes. Numerous witnesses testified that they received so many e-mails that they ignored any new e-mails transmitted into their system. See Lublin 25–27. A number of deponents confirmed that not all associates have access to e-mail and that, therefore, many individuals never received any of the PROFS notes regarding document retention (unless persons with access to e-mail had made copies for them). See, e.g., Myers 35 (not all associates have computers); Mariani 59–60 ("not each rep had their own terminal which they would access"); Sullivan 18 ("Not everybody is on the system."); Melquist 32–33 (approximately 1100/2700 agents have e-mail).

Nor were the various PROFS Notes ever printed and made available for general review. In fact, while Prudential's counsel provided plaintiffs with a list of all of the notices that were distributed with regard to document destruction, that list was not produced until December 24, 1996, after almost all of the depositions were completed or already in progress. See Ryan Ex. 1. In addition, as of December 25, 1996, defendants' counsel had yet to locate and produce almost half of the documents identified on the list.

There was no communication to anyone in any written or PROFS note format regarding the entry of the Court's document preservation order, its import, or the ramifications of violating such a Court order. Grier 97. To date, discovery has shown that neither Prudential, nor its counsel, have ever circulated to anyone at Prudential a copy of the Court's document preservation order or any written directive regarding the Order itself.[4] See Grier 97; Ryan 31.

### B. Testimony of Prudential Top Management

Prudential top management—Chairman Arthur Ryan, Executive Vice President Rodger Lawson, Chief Financial Officer Marc Grier, and General Counsel James Gillen—all recognized that the sales practices lawsuits and regulatory investigations are an extremely important part of Prudential's business. See, e.g., Grier 14; Gillen 27. More importantly, they all recognized Prudential's obligation to preserve documents in connection with the lawsuits and investigations. Yet, none took an active role in formulating, implementing, communicating, or conducting a document retention policy.

---

**4.** The notices also failed to make any mention of improper sales practices relating to investment or retirement claims. See generally Compendium.

Rather, all of them relied on others to do these tasks. *See, e.g.,* Ryan 35, 50.

Arthur Ryan, Prudential's Chief Executive Officer, recognized that it was management's responsibility to communicate the Company's document retention directives to its employees. Chairman Ryan kept abreast of the litigation on a regular basis. In 1995, Chairman Ryan held monthly meetings on the litigation and investigation. Ryan 19. In 1996, William Yelverton, head of individual insurance, took over the monthly meetings, but he and Gillen kept Ryan regularly informed. *Id.* Chairman Ryan stated that with respect to document retention he had:

a pretty good understanding of what is required to insure that people understand what they are supposed to do. The management did communicate through certain written vehicles, but equally important, in all *communications, it's the obligation of management to insure that people understand* that laws are to be followed, regulations are to be followed, and doing the right thing is to be followed.

Ryan 27–28 (emphasis added).

According to Chairman Ryan, he fulfilled his own personal obligation in this regard by referring the preservation of documents issue to the Prudential Legal Department and felt comfortable that the proper policy would be implemented. *See* Ryan 35–36. Ryan stated that:

The interpretation of what is required by the law, the regulation is the responsibility of the law department. It is also their responsibility to communicate it to line management. The business unit is then responsible for understanding what goes on in their operations, and would be the ones responsible as they learned it, to communicate it immediately.

Ryan 50.

When Chairman Ryan was informed that virtually every Prudential agent who was interviewed or deposed in connection with the Cambridge incident denied having knowledge of communications concerning document retention, he indicated that if this were true he "would be extremely dissatisfied." Ryan 28.

Marc Grier, Prudential's Chief Financial Officer, had very little knowledge or understanding about document preservation requirements. He testified that he had never seen "something in writing" which "demonstrated what the clear policy of the Company was." *See, e.g.,* Grier 54. Grier did not recall ever seeing the Audit Blueprint. *Id.* 56. Grier acknowledged that management has a responsibility to make important things clear to people within the organization, and also agreed that when it comes to observing court orders, an organization not only must advise the organization of any court-ordered responsibility, but also must audit its compliance. *See id.* 92–94.

Grier never inquired into whether the Mahoney PROFS note communication of August 15, 1995 was part of a printed manual that was in the libraries of offices around the country for people to access easily. *Id.* 91. Moreover, Grier admitted his concern that information about this Court's September 15, 1995 document preservation order was never disseminated to Prudential employees:

Q. Do you believe today that the employees of Pru were made aware of Judge Wolin's document preservation order?

A. No, I don't believe that.

Q. Does that concern you?

A. Yes, it does.

Grier 97–98.

Rodger Lawson, Prudential's Executive Vice President in charge of planning and marketing, joined the company in June 1996. Lawson 7–8. Lawson testified that he was sure that the company had an adequate policy, but that he was not directly involved in implementing or communicating it:

I am quite certain that the insurance company has clear instructions as to the preservation of documents. I am quite certain that they exist in some volume. Precisely what is in each of those documents, I cannot attest to. I have seen some of them and I have not read them in detail, and I believe the insurance company is

responsible for issuing those instructions and maintaining them.

Lawson 14.

Senior Vice President in charge of auditing, Priscilla A. Myers, was personally aware of the preservation order, but did not know whether compliance review employees were made aware of it. Myers 42–43.

James Gillen, Prudential's Senior Vice President and General Counsel, relied heavily on Richard Meade and Deborah Bello–Monaco, two attorneys for the individual insurance division of Prudential, to see that proper document retention procedures were developed and implemented. Gillen had little personal involvement in this issue. Gillen 25.

Gillen testified that over the past two years Prudential has issued a variety of communications on document retention, primarily in the form of PROFS notes. Gillen 21. Gillen testified that with respect to messages sent by PROFS notes:

> Anybody who has a terminal on their desk would have received this. And they're in offices where typically these kinds of instructions provide that people are—that the people in offices that have terminals should share the documents with others that don't.

Gillen 86.

Thus, Gillen testified that Prudential relies upon associates being apprised of PROFS notes by those who have the equipment to receive them. *Id.* 87. When asked whether he had taken any steps to notify Prudential employees and agents that the Court had entered a document preservation order, Gillen replied that he "felt that our [Prudential's] existing policies of communications were adequate to meet the requirements of the order." *Id.* 93.

While Gillen did not believe that a separate communication concerning the September 15, 1995 Order was necessary, Gillen did notify Prudential employees of this Court's subsequent entry of an Order dealing with plaintiffs' communication with Prudential employees. Thus, on April 2, 1996, Gillen personally sent a PROFS note to all Prudential associates. This PROFS note, which was found in the Cambridge Office, stands in stark contrast to the absence of any such communication from Gillen regarding the September 15, 1995 order. It describes this Court's order concerning employee interviews and explains the implications for Prudential employees:

> As you know, Prudential has been sued in certain state and federal courts concerning allegedly improper practices in the sale of life insurance products. The federal actions have been consolidated for pre-trial purposes before Judge Wolin of the federal court in New Jersey under the caption 'In re: The Prudential Insurance Company of America Sales Practices Litigation,' Master Docket No. 95–4704 (AMW). We are vigorously defending these actions.
>
> Several current Prudential employees have expressed their concern to us that plaintiffs' counsel in the federal action have been calling them trying to set up interviews to discuss their knowledge of the company's policies and procedures. You, too, may receive such a call. Judge Wolin has ruled that plaintiffs' counsel may contact you. However, he has also ruled that you need not talk to plaintiffs' counsel. In addition, Judge Wolin has ruled that you can discuss any contacts from plaintiffs' counsel with a member of Prudential's Law Department or with your own attorney. I have instructed all the attorneys in the Prudential Law Department to make themselves available to assist you in these matters.

Breedlove Cambridge Ex. 106. It should be noted that e-mail rather than hard copy distribution was used in this instance as well.

**C. How Communications Worked in the Cambridge Office**

John Breedlove, Managing Director of the Cambridge Office, testified that either his assistant, Mary McHugh, or business manager, Bette Komanski, was responsible for reviewing incoming PROFS notes and bringing important notes to his attention. Breedlove 126, 195. Breedlove would then direct McHugh to distribute those PROFS notes that he felt were worthy of distribution.

Several PROFS notes relating to document retention were found in binders on McHugh's desk marked "PROFS Notes Sent

and PROFS Distributed to Associates." Breedlove Cambridge Ex. 106–111. Additionally, many PROFS notes were marked by either Breedlove or McHugh as "distributed," with a specific date of distribution. However, neither the August 15, 1995 Mahoney, nor the March 14, 1996 Thierren PROFS notes were marked for distribution, and most of the Cambridge Office agents who have been deposed or answered plaintiffs' questionnaires have denied ever seeing any of the PROFS notes relating to document retention. Rider 34; McGloughlin 48, 59; Sayan 30–32.

In addition, hard-copy memoranda were not sent to each individual agent. Rather, they were sent to Komanski for office-wide distribution. Akers 70. As of the beginning of December 1996, Komanski had not yet distributed the November 1996 Frawley memorandum to agents within the Cambridge office. Akers 70–71.

Many agents in Prudential's Cambridge Office were questioned by Prudential after the disclosure of the Breedlove incident about their awareness of the three document retention PROFS notes circulated within their division, PPFS. Mahoney 8/95, Hahn 9/95, Ryan 8/96. These agents uniformly were not aware that these memos even existed. At most, out of fifty-seven agents interviewed by Prudential and its counsel,[5] seven agents were aware of the Mahoney document retention e-mail; four were aware of Ryan's document retention e-mail; and eight were aware of Hahn's document retention e-mail. See Cambridge Ex. 12–33; Questionnaires completed during Prudential Interviews of Agents From Boston FSO, CAM 000567–CAM 000902.

Similarly, many agents testified when deposed that they never received Prudential's document preservation notices. For example, Thomas F. Rider, an agent in the Cambridge Office, testified that he does not use the Computer Communication System at Prudential. See Rider 25. Accordingly, Rider testified he had never seen the Mahoney August 15, 1995 e-mail. Rider 34.

Similarly, William G. McGloughlin, III, an agent in the Cambridge Office, testified that he had never received documentation in a memo form that directed him to preserve documents because such documents could be evidence in a court proceeding. See McGloughlin 40. When asked if he accessed the electronic mail system at Prudential, McGloughlin testified that:

> I am on it but I don't access it, if that makes any sense. I am signed on but there are over 700 messages waiting there because I don't know how to use it and I don't have time to learn how to use it.

McGloughlin 43.

### 3. The Cambridge Document Destruction Incident

#### A. Background

Like all PPFS offices, the Cambridge office is subject to both routine and unannounced compliance inspections. Gonzalez 53.

On January 27, 1995, prior to any 1995 compliance inspections, John Breedlove, Managing Director of PPFS' Cambridge Office, advised the associates in that office:

> It is *critical* that all *unapproved sales material* in your possession be destroyed. Use of unauthorized material is a very serious *violation* and we have just completed destruction of all outdated materials in our supply area.

Gonzalez Ex. 7 (emphasis in original).

On April 5, 1995, members of Prudential's compliance review team, Bill Clark and Dean Schroeder, arrived at the Cambridge office unannounced, to perform a surprise compliance review. Tignanelli Ex. 28 at CAM 000966. The review team asked to check sales literature and all other items available to assist agents during the sales process. *Id.* During the inspection, the review team reviewed the supply areas, agent work spaces, and client files. *Id.* The Cambridge Office was cited for failure to adequately regulate the materials in the supply room, the agents' cabinet, and the training room. *Id.* at CAM 000968. Specifically, many of the sales materials that the review team found in these

---

5.  Prudential produced its notes from these inter-     views to plaintiffs' counsel.

areas were not listed in the March 1995 Marketing Resources Guide ("MRG") and, thus, were unapproved. *Id.* Therefore, the auditors themselves discarded these outdated materials in accordance with Prudential's document destruction policy:

> We reviewed the materials in the supply room and the materials available to agents.... If the materials that we found on the shelves were not listed in the MRG, we *discarded* them. A listing of these materials can be found in Attachment I.... An old *CONCEPTS* manual was also destroyed by Jim Kenealy [BOSX Computer Specialist] when it was pointed out that it had a visual presentation of what was previously known as the 'Private Pension Plan.'...
>
> The training room contained many tapes and books. It also included old ACPP books (ORD 88672 & 88612) which we *discarded*.... We also *discarded* some office stationery and blank business cards that did not comply with the guidelines....

Tignanelli Ex. 28 at CAM 000968, 975, and 977 (some emphasis added and some in original).

During the April 5, 1995 investigation, the compliance review team also discovered that agent Zhen–Jing Sun was sending out unapproved correspondence. The unauthorized correspondence located in agent Sun's files was a letter in Chinese that when translated to English used terms such as "retirement Plan" and "Estate Planning." Pearson Ex. 5 at CAM 000463. On June 22, 1995, Michael Cataldo, Executive Director for the northeast marketing territory, sent a sanctions letter to agent Sun assessing him a fine of $250 for using a piece of unauthorized correspondence. *Id.* at CAM 000481.

On May 25, 1995, Bette Komanski, the office Business Manager, sent a letter to Breedlove advising him that she had discarded some outdated sales material:

> Reference was also made to the Silver Dollars Kit. To tell you the truth, I had no idea what was in this because they are shrink wrapped. So while most of the kit is good, there were brochures inside which were outdated. I *discarded* these.

Breedlove Cambridge Ex. 104 at CAM 000982 (emphasis added).

Thereafter, a routine annual compliance review for the Cambridge office was scheduled for mid-August 1995. Tignanelli Ex. 28 at CAM 000994. In anticipation of this review and upset about the fine levied against agent Sun, Breedlove issued a memorandum dated August 7, 1995, directing all associates to *"please review your files during this week and discard any unapproved sales materials."* Gonzalez Ex. 6 at CAM 000948 (emphasis in original).

On August 17 and August 18, 1995, auditors Jeff Soderstrom and Marty Lewis inspected the Cambridge Office. Tignanelli Ex. 28. Their report, dated October 10, 1995, does not discuss the existence of Komanski's May 25, 1995 letter to Breedlove or Breedlove's August 7, 1996 document destruction memorandum, nor does it mention any evidence of document destruction at the Cambridge Office *Id.* at CAM 000994–1007. Rather, the report commends Breedlove for doing a fine job of establishing an "In Control" operation and for instituting procedures to monitor sales material. *Id.* The report, however, did address other areas in which the auditors expressed specific concern. The auditors concluded that other areas of liability exposure existed at the FSO, and that the implementation of management controls was necessary. *Id.* The report specifically suggested that Breedlove implement individual agent marketing material audits. *Id.* The auditors also suggested that Breedlove implement a system to spot-check agent correspondence. *Id.*

Thereafter, in a written memorandum to his associates on February 1, 1996, Breedlove declared that his office would conduct a client file review. Grier Ex. 1. Breedlove's directive stressed the need to "immediately" make sure that client files are "in compliance." He advised all associates that he had designated Cheryl Rizzo to assist with the audit of the client files and that this would reduce "exposure" and "liability":

> One area that we need to work on immediately is making sure that client files are in Compliance. To assist you in your efforts

in this area, I am going to have Cheryl Rizzo visit with each agent and do an audit of your client files to make sure that they are in Compliance and to reduce your exposure and liability relative to this issue. *Id.* The intention was to cleanse all the agent files prior to the next regular audit scheduled for November 1996. Komanski 31.

Hence, from February 1996 to November 1996, at Breedlove's direction, Rizzo reviewed every client's file from every active agent in the office, including the district office in Westborough.[6] Rizzo 30. Rizzo discarded all undated, handwritten notes, as well as any unapproved sales material that appeared to have been used following the 1994 moratorium on the use of such material. Gillen Ex. 3 at CAM 001033–34 (memo from David Greenbaum to Reid Ashinoff dated December 11, 1996). Rizzo's audit involved the cleansing of approximately 9,000 client files, and the destruction of approximately eighty "folders of documents." Rizzo 31; Gillen Ex. 3. In addition, Rizzo testified that she believed that some agents cleansed their files before her audit, and that additional documents may have been discarded. *Id.* at 73.

## B. Discovery of Destruction

On November 20, 1996, Prudential compliance auditors Russ Spaulding and Melissa Gonzalez commenced the routine annual field office compliance review of the Cambridge Office. Spaulding 34, 40–41. At the start of this review, Breedlove reported his personal document destruction policy, Spaulding 36, and a short time later, Gonzalez discovered Breedlove's February 1, 1996 memo. Gonzalez 49–50. Breedlove also asked Rizzo to describe her actions for the auditors. Spaulding 68–71.

It appears that Russ Spaulding, the auditor in charge of the November 1996 Cambridge audit, did not consider the document destruction as a matter of urgency. Spaulding was informed of the Cambridge incident by Breedlove on Wednesday, November 20, 1996, but did not report the incident to his

supervisor, William Reynolds, until a phone call on Tuesday, November 26, 1996. Spaulding 40–41. Spaulding completed the audit before further investigating the document destruction. *Id.* 55–56. He did not substantively discuss the incident with Reynolds until December 2, 1996. Reynolds 44–45. Spaulding did not include document destruction in his initial memo of significant issues that arose during the audit. Spaulding 48–49. On December 4, 1996, Spaulding prepared his first full written report on the Cambridge incident. He prepared a "Compliance Memo" to the Development Unit regarding the document destruction incident. Spaulding 52–53. This memo stated that Breedlove had brought the document destruction incident to Spaulding's attention during the compliance review. *Id.* Spaulding recommended that Breedlove be punished for the document destruction incident by issuance of a warning letter rather than suspension or termination. Spaulding 63.

On Thursday, December 5, 1996, Jeff Soderstrom learned about the incident in a conversation with Spaulding. Soderstrom 67. Soderstrom then instructed Spaulding to contact James A. Tignanelli and apprise him of the destruction. Soderstrom 76–77. Spaulding sent an e-mail to Tignanelli and to Tignanelli's superior, Kevin Frawley. Soderstrom and Tignanelli established that Corporate Compliance should take the lead in further investigating the incident. Soderstrom 79–80, 82–83. Tignanelli sent a copy of Spaulding's e-mail to in-house counsel, Francine Boucher. Tignanelli 326, 337, 343.

On Friday, December 6, 1996, after discussing the matter with Tignanelli, Richard Mariani, Director of Development, called Spaulding and advised him that the Development Unit of the Compliance Department would take over the handling of the investigation. Spaulding 50. Tignanelli "was basically trying to cut off whatever activity Spaulding was trying to generate and then [turn] it over to Fran Boucher [of the law department]." Tignanelli 334–35. Tignanelli told Mariani to get copies of the compliance

---

**6.** Rizzo continuously worked on this project. Just before the November 20, 1996 compliance review, she worked overtime to ensure completion prior to the compliance inspection. Rizzo 30.

memo to him and the law department, "and then sit back and wait for them to tell us what to do, and I told him I would meet with Fran the next day [December 6]." Tignanelli 345.

Tignanelli met with Boucher at approximately eleven o'clock on December 6. Tignanelli 350. Boucher told Tignanelli that the law department would handle the situation. "They would be getting in touch with outside counsel. They would get in touch with whoever, and that we weren't to do anything until they told us what we were going to do. I said fine. Just let us know whatever you want us to do and we'll do it." Tignanelli 353. Tignanelli was "pretty sure" Boucher had read the memos because "she acted like she did." *Id.* 355–56. Tignanelli told Boucher that Tignanelli's department had contacted the PPFS people and communicated to them not to do anything because the Law Department was now going to handle the situation. *Id.* 357. Assistant general counsel Richard Meade also learned of the incident in a brief conversation on December 6, 1996. (He didn't recall how he learned about it.) Meade 6.

On Monday, December 9, 1996, Prudential's lead outside attorney, Reid Ashinoff, was told of the document destruction. Ashinoff Affidavit at 5; December 18, 1996 Tr. at 33. Ashinoff asked one of his partners, David Greenbaum, to go to Cambridge to investigate. Ashinoff Affidavit at 5.

On either December 9 or December 10, 1996, Meade, the in-house lawyer in charge of these litigations, discussed the incident in brief conversations with another in-house attorney Deborah Bello–Monaco and Gillen. Meade 9. Greenbaum, Rochelle Barstow (another attorney with Sonnenschein), and Sherry Akers (a Prudential compliance manager), interviewed Breedlove, Rizzo, and Komanski in Cambridge on December 10, 1996. CAM 001027–001032. After these interviews, Greenbaum gave Boucher an oral report about the Breedlove document destruction and Boucher relayed the information to her colleague Bello–Monaco. Boucher 38–39. Barstow prepared a memorandum to Greenbaum outlining the chronology of events and provided a summary of the employee inter-

views. CAM 001027–1032. Greenbaum received a facsimile transmission from Rizzo containing her "best guess" that 9,125 client files were reviewed. CAM 000903–906.

Senior Vice President and Auditor Priscilla Myers, to whom Tignanelli and Frawley reported, learned from Gillen on "Monday or Tuesday, December 10 or 11" that documents were discarded. Myers 88–89.

Late in the afternoon on December 11, 1996, Ashinoff met with Prudential senior management, Arthur Ryan, James Gillen, and Marc Grier, and apprised them for the first time of the Cambridge incident. Ashinoff Affidavit ¶ 1a. According to Ryan and Grier, they had no prior knowledge of the incident. Ryan 45; Grier 63–64.

On Friday, December 13, 1996 there were meetings at Prudential's corporate office the entire day. Bello–Monaco 27–28. During the morning meeting, Ashinoff met with Prudential senior management Gillen and Bello–Monaco. Bello–Monaco 24–25. Later, Ashinoff left the meeting to attend the hearing in this Court on the motion for recusal brought by counsel for Kittle and Krell.

After the Court hearing on December 13, Ashinoff returned to Prudential's corporate office and met with Ryan, Grier, and others. Bello–Monaco 26–28. They made a tentative decision to terminate Breedlove, and public relations executives Robert DeFillippo and Richard Riley began to prepare a public relations statement. Bello–Monaco 46; DeFillippo 45–46.

Thus, by Wednesday, December 11, 1996, the essential facts about the Cambridge incident were known to senior management. Sonnenschein attorney David Greenbaum had completed his preliminary investigation. According to CFO Grier, it was apparent by that time that Breedlove would be fired. Grier 79. Prudential management acknowledged that they needed to notify the Court, plaintiffs' counsel, and the New Jersey Department of Insurance about the Cambridge incident, preferably simultaneously. Gillen 121 ("Our intent was to inform plaintiff's counsel, [the] regulator and the Court, as soon as possible and at the same time"). Prudential management continued to discuss

the matter on Friday, December 13, 1996, Saturday, December 14, 1996, and Sunday, December 15, 1996. Ryan 76–77; Gillen 129–130; Grier 87–88. Plaintiffs' counsel was notified on December 14, 1996, and the New Jersey and Massachusetts regulators, and the Court, were notified on Monday, December 16, 1996. Also, Breedlove was notified of his firing on December 16, 1996.

### 4. The Syracuse Office

Several different allegations of improper treatment of documents have recently surfaced in connection with Prudential's Syracuse office.

A number of the incidents involved Paul J. Berrafato, the General Manager of the Syracuse office, who has served as General Manager in Syracuse for twenty years.[7] Berrafato 7. First, Berrafato removed approximately ten/fifteen tapes from that office immediately prior to a visit from Prudential's compliance personnel in the late summer or fall of 1996. *Id.* at 62–63, 84–87. Prudential learned of that incident as a result of allegations made by the ABC television program *Prime Time Live*. Tignanelli 281–82; Bello–Monaco 70–75.

Berrafato testified that he needed to review the tapes to see whether they were still approved for use. Berrafato 63, 85–86. Because he did not have time to do that before the visit from Compliance, *id.* at 85, he put the tapes into the trunk of his car, allegedly intending to review them at home. *Id.* at 62–63. Berrafato admitted that, in doing so, he "may have used poor judgment." *Id.* at 63.

In fact, it is a fair inference that Berrafato attempted to conceal the tapes until the compliance review was over. He testified that he was concerned that if Compliance had found the tapes, they would have criticized him because he had not gone through them. *Id.* at 85–86. Berrafato did not reveal to Compliance that he had secreted the tapes and that they therefore were not available for Compliance to review. *Id.* at 86. Ultimately, in fact, despite his stated intention, Berra-

fato never did go through the tapes Instead, he admitted that they ended up "back in [his] office and in the same box, and [he] still did not have a chance, [he] never used them, and [he] just [has] not gone through them to see which is approved and which isn't." *Id.* at 63–64.

Berrafato admitted to instances in which he or the Syracuse office manager directed that documents be discarded, destroyed or thrown away. *See* Berrafato Ex. 5. Although Berrafato initially testified that he had done so in only one memorandum, Berrafato 66–67, the documents that he produced thereafter showed memoranda dated March 20, 1995, September 1, 1995 (discussed above), May 2, 1996, and May 9, 1996, all of which contained such directions. *See* Berrafato 73–84 (summarizing and quoting relevant portions of memoranda). A memorandum form the Syracuse Office Manager, Arlene Shore (also included in Berrafato Ex. 5), dated August 28, 1995, also ordered the disposal of documents. *Id.* Berrafato testified that Shore was in charge of the Syracuse office's document retention function, and that he had never known her to deviate from Prudential company policy on that subject. Berrafato 69–70.

Two of Berrafato's memoranda (dated May 2 and May 9, 1996) that ordered sales people to "throw away" or "discard" documents, post-dated this Court's September 15, 1995 Order requiring the document preservation. Berrafato testified that he had never seen either the September 15, 1995 Order or its "Preservation of Documents" provision. *Id.* at 35–36, 37. He could not recall whether Prudential had issued any communication that advised that documents were to be preserved pursuant to a judge's order. *Id.* at 38–39. He testified that he might not have sent those memoranda if he had known of the existence of the Court's September 15, 1995 Order with the "Preservation of Documents" provision. *Id.* at 113.

Berrafato stated that he believed he was acting in accordance with Prudential corpo-

---

7. During the investigation, plaintiffs' counsel learned of an allegation that documents were removed from the Syracuse office and placed in the trunk of the office manager's car in advance of a compliance check by state regulators. Other than as described herein, Berrafato denied that this or any similar incident of document removal ever took place. Berrafato 89–91.

rate policy when he sent the 1995 and 1996 memoranda included in Berrafato Ex. 5. *Id.* at 114. Berrafato never saw either of the two e-mail messages (August 17 and September 14, 1995) that Prudential had sent regarding corporate document retention policy, and testified that those memoranda were not sent to PPFS offices such as Syracuse. *Id.* at 43–44. The first of the corporate communications on the subject that Berrafato saw was Ryan's memorandum of August 14, 1996. *Id.* at 44.

With Winston Churchill's admonition in mind that this is not the end; that this is not the beginning of the end; but this is the end of the beginning, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The Court's Order of September 15, 1995 which required, *inter alia*, that all parties "preserve all documents and other records containing information potentially relevant to the subject matter of this litigation" was never disseminated to Prudential employees.

2. Senior management, inclusive of Arthur Ryan, Prudential's Chief Executive Officer, Marc Grier, Prudential's Chief Financial Officer, Priscilla A. Myers, Senior Vice President in charge of auditing, and James Gillen, Prudential's Senior Vice President and General Counsel, never directed that the Court's Order of September 15, 1995 to preserve documents be disseminated to Prudential employees. Gillen was satisfied that Prudential's existing communications policies were adequate to meet the requirements of the Court's Order. Thus, Gillen did not believe that a separate communication concerning the Court's Order was necessary.

3. Commencing in August 1995, Prudential issued several PROFS notes (e-mail) directed to document preservation. While they cautioned against the destruction of documents, these one-page memoranda failed to specifically mention the putative class action litigation then pending before this Court in

the District of New Jersey. Moreover, the memoranda subsequent to September 15, 1995, failed to inform the recipients of the Court's document preservation Order.[8] In these notes, "litigation" is referenced in the most general sense as "litigation alleging improper sales practices." Not until November 6, 1996, does a PROFS note mention a class action. Even then, the only reference is to the settlement agreement.

4. The record is devoid of any reference to a document that would encourage non-management employees to report evidence of document destruction, for example, through the use of a telephone hotline or otherwise.

5. PROFS notes provided the names and telephone numbers of individuals to contact in the event that questions arose about document retention. No specific individual was designated as the primary contact source for information about document preservation.

6. On August 14, 1996, Arthur F. Ryan, Chairman and Chief Executive Officer, issued a PROFS note addressed to Prudential associates. It was entitled "Announcement." The announcement centered on the destruction of documents that had occurred in the Greater Southern Regional Office located in Jacksonville, Florida. Ryan referenced three Prudential internal orders as the foundation of Prudential's policy to preserve documents. Ryan did not mention this Court's Order to preserve documents or the class action litigation pending before this Court. Finally, Ryan informed the recipients that Prudential had notified several regulatory authorities of the failure to preserve documents in Jacksonville. Notwithstanding the prior preservation Order issued by this Court and the violation of that Order, both Ryan and Prudential *failed to notify this Court* of the Jacksonville occurrence.

7. The admonition to preserve documents and not to destroy documents set forth in the PROFS notes was styled in ordinary print. Neither of these admonitions were delineated in emboldened or enlarged font:

---

8. Some of the PROFS notes caution that any willful or deliberate violation of these guidelines will result in serious disciplinary action, up to and including termination. No mention is made

of sanctions provided for by the Federal Rules of Civil Procedure, civil contempt for violation of an Order of the Court, or criminal contempt pursuant to 18 U.S.C. § 401(3).

# PRESERVE DOCUMENTS - DO NOT DESTROY DOCUMENTS.

8. Prudential's use of PROFS notes to preserve documents and to prevent their destruction was ineffective and failed to implement this Court's document preservation Order. The Report of Investigation demonstrably highlights the PROFS notes inefficacy. Witnesses testified that they ignored e-mails, some testified that they lacked access to e-mail (approximately 1100/2700 agents have e-mail), and others testified that PROFS notes were not always printed and made available for general review.[9] Prudential, in its response to plaintiffs' Report of Investigation, concedes that it could have done more to ensure compliance with its document preservation directives.[10]

9. Prudential's Managing Director Audit Blueprint is not a document preservation policy statement. It is a marketing document in the form of a written manual printed in a format that allows it to be retained by individual company employees and placed on company bookshelves. The Audit Blueprint was designed to provide a standardized procedure and checklist for Managing Directors to enable them to keep abreast of the ongoing changes in marketing material so that they would know what was and was not approved material.[11] The Audit Blueprint is inconsistent in its posture towards document preservation. In at least two locations it counsels that "disapproved material" and "out-of-date marketing material" should be destroyed. As stated in the Report of Investigation at 6, the only reference in the Audit Blueprint to document preservation is found in footnote 15, which states that unapproved marketing material found in a client file should not be destroyed. The Audit Blueprint was dated and distributed to Managing Directors in May 1995, approximately four months prior to the issuance of this Court's document preservation Order.

10. The Court has no record of any written manual that would evidence that Prudential possesses a clear and unequivocal document preservation policy capable of retention by Prudential employees and available for easy reference.

11. Although the PROFS notes specify the types of materials that should be preserved and counsel against document destruction, these PROFS notes do not constitute uniform guidelines and do not represent the systematic process necessary to preserve documents. Indeed, not until November 13, 1996, did Prudential prepare and distribute a document entitled "Interim Document Retention Guidelines."

12. As of the writing of this Opinion, document destruction has occurred on at least four occasions. Despite the PROFS notes, documents have been destroyed in Jacksonville, Florida, Cambridge, Massachusetts, Des Moines, Iowa, and in Syracuse, New York. Additionally, in Syracuse, materials were spirited out of the office and secreted to avoid detection by internal Prudential compliance review teams.

13. Prudential acknowledges that document destruction has occurred at all of the above locations.

14. The document destruction that occurred in Cambridge is particularly unfortunate because of its magnitude and the failure to prepare a document destruction index. Approximately 9000 client files were cleansed and eighty "folders of documents" were destroyed.[12] Thus, the Court and the litigants are currently unaware of the documents that were destroyed and the files from which these documents were taken. Without a document destruction index or some other procedure, all concerned are forever foreclosed from the receipt of this information.

15. The document destruction in Cambridge occurred between February 1996 and

---

9. Report of Investigation at 11.

10. Response of Prudential at 7.

11. *See* Soderstrom Ex. 1 and 5.

12. Report of Investigation at 22.

November 1996, a period subsequent to the entry of this Court's document preservation Order.

16. Document destruction at the Des Moines, Iowa office involved 150 documents which were removed and discarded from 200 policyholder files. The activity that occurred in Des Moines clearly violated the Order of this Court. Moreover, Prudential concedes in its response to the Report of Investigation that "the document retention directives ... were not sufficiently clear on their import. Prudential management again must take responsibility for this failing." Response at 13.

17. Prudential's procedures to identify and report document destruction to senior management are unduly cumbersome and slow.

(a) Destruction of documents at the Cambridge, Massachusetts office was ascertained by routine audit on November 20, 1996.

(b) The auditor's supervisor was notified of the document destruction on November 26, 1996.

(c) The auditor's report, termed a "Compliance Memo," that described the document destruction was submitted to the Prudential Development Unit on December 4, 1996.

(d) Other Prudential employees learned of the document destruction on December 5, 1996.

(e) The Prudential Law Department learned of the document destruction on December 6, 1996. Assistant General Counsel Richard Meade also learned of the Cambridge incident on December 6, 1996.

(f) Prudential's lead outside counsel was told of the document destruction on Monday, December 9, 1996.

(g) Prudential's General Counsel James Gillen learned of the Cambridge destruction incident on either December 9 or December 10, 1996.

(h) Senior Vice President and Auditor Priscilla Myers learned of the document destruction from Gillen on either December 10 or December 11, 1996.

(i) Arthur Ryan, Chief Executive Officer, learned of the document destruction late in the afternoon of December 11, 1996 during a conference with Reid Ashinoff, James Gillen, and Marc Grier. Until that meeting, Grier had no notice of the prior destruction incident.

(j) Insurance regulators and the Court were notified on December 16, 1996.

18. Approximately twenty-one days elapsed between discovery of the document destruction and its report to senior management Ryan, Grier and Myers. Twenty-six days elapsed between the discovery of document destruction and notification of insurance regulators and the Court.

19. Prudential's senior management has failed effectively to establish a comprehensive document retention policy. The PROFS messages, while reflective of Prudential's intentions, lack sufficient content and detail to constitute a "policy" on document preservation.

20. The insufficiency of the PROFS notes and the failure to prepare and distribute a written document preservation manual made document destruction inevitable.

21. The failure of senior management promptly to ascertain and notify the Court of the Cambridge document destruction episode in particular is inexcusable in light of the December 19, 1996 exclusion date that required Cambridge policyholders to decide whether to remain in the class action.

### CONCLUSIONS OF LAW

1. The Federal Rules of Civil Procedure provide for sanctions when a party to a litigation fails to obey a pre-trial order. Fed. R.Civ.P. 16(f). Beyond the formal rules and legislative dictates, the Court possesses the inherent authority to punish those who abuse the judicial process. *Republic of the Philippines v. Westinghouse Electric Corporation,* 43 F.3d 65, 73 (3d Cir.1995). The reason for the rule and the warrant for its existence lies in the fact that a court, in order to achieve the orderly and expeditious disposition of cases, must have the control necessary to manage its own affairs. *Chambers v. NASCO,* 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991).

■ 2. While there is no proof that Prudential, through its employees, engaged in conduct intended to thwart discovery through the purposeful destruction of documents, its haphazard and uncoordinated approach to document retention indisputably denies its party opponents potential evidence to establish facts in dispute. Because the destroyed records in Cambridge are permanently lost, the Court will draw the inference that the destroyed materials are relevant and if available would lead to the proof of a claim. *See National Association of Radiation Survivors v. Turnage,* 115 F.R.D. 543, 557 (N.D.Cal.1987).

■ 3. When the September 15, 1995 Court Order to preserve documents was entered, it became the obligation of senior management to initiate a comprehensive document preservation plan and to distribute it to all employees. Moreover, it was incumbent on senior management to advise its employees of the pending multi-district litigation venued in New Jersey, to provide them with a copy of the Court's Order, and to acquaint its employees with the potential sanctions, both civil and criminal, that the Court could issue for noncompliance with this Court's Order.

■ 4. When senior management fails to establish and distribute a comprehensive document retention policy, it cannot shield itself from responsibility because of field office actions. The obligation to preserve documents that are potentially discoverable materials is an affirmative one that rests squarely on the shoulders of senior corporate officers.

## SANCTIONS

■ Through its findings of fact and conclusions of law, the Court is satisfied that the conduct of Prudential explicitly violates the mandate to preserve documents. The gravity of Prudential's conduct is especially troublesome in a complex litigation, such as this, that encompasses 10.7 million policyholders. From the very inception of this litigation, the allegations of document destruction have been a recurring theme. The accusations of document destruction not only threaten the integrity of this Court and the proceedings

before it, but further serve to undermine the foundations of our system of justice. Corporations, like Prudential, who seek access to the federal courts, have an obligation to comply with both the spirit and intent of the rules. Failure to fulfill this responsibility should be met with unwavering judicial disapproval.

### A. Rationale

In the exercise of its discretion to sanction, whether under the Federal Rules of Civil Procedure or under the Court's inherent power, the Court must consider the range of sanctions available and choose only those that are necessary to achieve the Court's purposes. Restraint and discretion are integral to the process. The adage "let the punishment fit the crime" is as true here as it was in Gilbert & Sullivan's "Mikado." W.S. Gilbert & Arthur Sullivan, *The Mikado,* in The Complete Plays of Gilbert & Sullivan 343, 352 (1938).

In the *Republic of the Philippines,* the Third Circuit provides a two-part test with concomitant factors to determine whether and which sanctions are appropriate. 43 F.3d at 74.

First, the Court must consider the conduct at issue and must explain why the conduct warrants sanctions. *Id.* A pattern of wrongdoing may require stiffer sanctions than an isolated incident. *Id.* A grave wrongdoing may compel more severe sanctions than a minor infraction. *Id.* And wrongdoing that prejudices the wrongdoer's opponent or hinders the administration of justice may demand a heftier response than wrongdoing that fails to achieve its "untoward object." *Id.* Mitigating factors, if any, must shape the Court's response also. *Id.*

Second, after evaluating the conduct at issue, the Court must consider the range of permissible sanctions and must explain why less severe sanctions are inadequate or inappropriate. *Id.*

### 1. Actual Factual Predicate

■ Here, Prudential violated the Order of the Court to preserve documents and failed to advise its field offices (334 field

offices) of the pendency of the litigation and the Court-ordered requirement to preserve documents. While e-mail is an appropriate means for a corporation to disseminate its policy, the internal orders directed to the field by Prudential lacked coordination and represented a haphazard response to a serious problem of judicial administration. Moreover, because documents have been destroyed, they can never be retrieved and the resultant harm is incalculable. It is inexcusable that reports of document destruction were unduly delayed at a time when urgency of notification was particularly relevant.[13] Thus, the Court concludes that there exists a more than adequate factual predicate to sanction.

### (a) Pattern of Wrongdoing

The Court finds that Prudential's consistent pattern of failing to prevent unauthorized document destruction warrants the imposition of substantial sanctions. Four field offices have reported document destruction. One of those field offices has engaged in deceptive removal of documents to avoid audit. Prudential has acknowledged that its PROFS notes failed to achieve document retention and prevent document destruction. Yet, Prudential still has not sent the Order of this Court to the field, nor fully explained the need for document retention. Accordingly, the Court finds a repetitive circumstance that requires correction and that merits the imposition of sanctions.

### (b) Willful Misconduct

The Court finds no willful misconduct to have occurred.

### (c) Prejudice to a Party Opponent

The Court finds that the document destruction, particularly in the Cambridge, Massachusetts office, caused harm to party opponents. Over 9,000 files were cleansed. Prudential is unable to specify what documents were taken from files, nor is it able to identify the files from which the documents

were taken.[14] Because the prejudice to affected party opponents is so substantial, Prudential's consistent pattern of failing to curb document destruction, which at the very least was grossly negligent conduct, merits sanctions, despite the Court's finding that Prudential's conduct was not willful.

### (d) Whether the Conduct Hindered the Administration of Justice

Document destruction inevitably hinders the administration of justice. The record is replete with references to document destruction and Prudential was repeatedly admonished by the Court that if Prudential engaged in document destruction, they would do so at their peril. By virtue of the time devoted to document destruction, both in and out of court, and the public frenzy it created, the Court is satisfied that the destruction of document issue has hindered and burdened the administration of justice.

### (e) Mitigating Factors

The Court finds no mitigating factors for Prudential's senior management failure to comply with the Order of the Court.

### 2. Less Severe Alternatives

The Court has considered the range of sanctions available and has determined that each of the sanctions imposed below befits Prudential's conduct and is absolutely necessary to remedy the waste of judicial resources that Prudential has caused and to protect the authority of the Court.

### C. Specific Sanctions

Although the considerations under Federal Rule of Civil Procedure 16(f) and under the inherent power of the Court are comparable, the Court will impose Federal Rule of Civil Procedure 16(f) sanctions as follows:

1. Within ten (10) days after the receipt of this Opinion, Prudential shall mail to every employee a copy of the Court's September 15, 1995 Order, together with a full explana-

---

13. The Court-ordered notice to policyholders required them to opt out by December 19, 1996.

14. Although the Alternative Dispute Process set forth in the settlement agreement contemplated

that documents would be inadvertently destroyed, the Court is unable to ascertain whether the remedial aspects of that agreement will fully address the harm incurred.

tion of the pending litigation and the civil and criminal sanctions that apply to the failure to follow an Order of the Court.

2. Within thirty (30) days, Prudential shall submit to the Court a written manual that embodies Prudential's document preservation policy. Such manual shall clearly and unequivocally establish guidelines for document retention, as well as the circumstances when a document may be discarded and the procedures to be employed when that event occurs. The plan shall include means to distribute the plan to each employee.

3. During the pendency of this litigation, Prudential shall dedicate a telephone "hotline" to facilitate reports of document destruction, if any. This hotline number shall be communicated to all employees and any caller's request for anonymity shall be respected. Each such call shall be recorded in a log to be monitored by a member of the Law Department. The date, the time of the call, and the field office involved are relevant matters that must be recorded. Reports of document destruction shall be promptly reported to the General Counsel and appropriate action taken.

4. During the pendency of this litigation, Prudential shall establish a certification process wherein each field manager shall certify that his/her office is in compliance with the document retention manual and has not engaged in document destruction contrary to Prudential's established policy.

5. Within ten (10) days after the issuance of this Opinion, Prudential shall pay to the Clerk of the United States District Court for the District of New Jersey, the sum of One Million Dollars ($1,000,000). This sanction recognizes the unnecessary consumption of the Court's time and resources in regard to the issue of document destruction. Moreover, this sanction informs Prudential and the public of the gravity of repeated incidents of document destruction and the need of the Court to preserve and protect its jurisdiction and the integrity of the proceedings before it. In the assessment of this

monetary sanction, the Court has considered the financial worth of Prudential and the minimal financial impact this sanction will have on Prudential's financial stability.[15]

6. Prudential shall promptly reimburse plaintiffs' counsel for all fees and costs associated with the motion for sanctions, the order to show cause, the depositions and discovery in preparation for the depositions, and the preparation and distribution of the Report of Investigation to the Court and counsel.

7. The sanctions contained herein are without prejudice to the subsequent imposition of additional sanctions as may be fair and appropriate to remedy unknown harm to individual party opponents caused by document destruction.

## CONCLUSION

Prudential has violated the Order of the Court on at least four occasions. It has no comprehensive document retention policy with informative guidelines and lacks a protocol that promptly notifies senior management of document destruction. These systemic failures impede the litigation process and merit the imposition of sanctions.

The sanctions imposed fall within the permissible range of sanctions. The imposition of any lesser sanctions would serve to diminish the harm that occurred, as well as the integrity of the proceedings before this Court.

---

**15.** It is not uncommon for large corporations with vast resources to impede the discovery process through methods and processes that frustrate the production of relevant and unprivileged documents. Courts must be vigilant to prevent that type of conduct when it occurs and must impose meaningful sanctions to protect the integrity of the proceedings before it.